1  QUINN EMANUEL URQUHART & SULLIVAN, LLP
     R. Brian Timmons (Bar No. 155916)
2    briantimmons@quinnemanuel.com
     Lee J. Rosenberg (Bar No. 287567)
3    leerosenberg@quinnemanuel.com
   865 South Figueroa Street, 10th Floor
4  Los Angeles, California 90017-2543
   Telephone:   (213) 443-3000
5  Facsimile:   (213) 443-3100

6  Attorneys for Petitioner
   Smart King Ltd.

7

8              UNITED STATES DISTRICT COURT

9    CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

10 | Smart King Ltd,                    | Case No: 2:18-cv-18-9499
11 |             Petitioner,            | **PETITION TO CONFIRM ARBITRATION AWARD**
12 |        v.                          |
13 | Season Smart Limited               |
14 |             Respondent.            |

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## PETITION TO CONFIRM ARBITRATION AWARD

1.     Petitioner Smart King Ltd. ("Smart King") brings this action to confirm the Award of the Emergency Arbitrator that was issued by the Hong Kong International Arbitration Centre ("HKIAC") in Case No. A18176 on October 25, 2018 ("Award") in favor of Smart King and against Respondent Season Smart Limited ("Season Smart"). *See* **Exhibit A**.

2.     The same day that the Award was issued, Season Smart's parent corporation published a false and misleading public statement on the Hong Kong Stock Exchange, characterizing the Award as being rendered against Smart King and in favor of Season Smart.  *See* **Exhibit B**.  That narrative has resulted in the spread of demonstrably false information about the Award that the relief requested in the arbitration was "rejected," that the HKIAC "upheld [Season Smart]'s role in approving new financing," that "Faraday Claims Victory as Request Denied," and that "Evergrande Ownership Upheld." *See* **Exhibit C**.

3.     Pursuant to Chapter II of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 201 *et seq.* and the Convention of 1958 on the Recognition and Enforcement of Foreign Arbitral Awards, 21 U.S.T. 2517, T.I.A.S. No. 6997, 200 U.N. 38 ("Convention"), Smart King petitions this Court to confirm the Award.

4.     Confirmation is appropriate because this application is timely made, the Convention applies to the Award, under the FAA, a court "shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention," and here none of the narrow grounds for refusal or deferral under the Convention are applicable.  *See* FAA § 201; Convention Art. V.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

### A.     The Parties and the Transaction Agreements At Issue

5.     Petitioner Smart King is a Cayman Islands corporation with its principal place of business in Los Angeles, California.  It is the indirect parent corporation of

Faraday&Future Inc. ("Faraday"), a revolutionary electric vehicle company that launched in 2014.

6.      Respondent Season Smart is a British Virgin Islands corporation with its principal place of business in Hong Kong S.A.R.

7.      In November 2017, Season Smart agreed to invest $2 billion in Faraday, to be paid in stages.  To formalize this transaction, Season Smart and Smart King entered into a series of interrelated agreements—an Agreement and Plan of Merger and Subscription (the "Merger Agreement," as amended, a Shareholders Agreement (the "SHA"), as amended, including most recently by the Amendment and Consent (the "Amendment"), pledge agreements, security agreements, and an intellectual property security agreement (together, the "Transaction Agreements").

8.      Season Smart has paid in capital of $800 million to date.  The remainder of $1.2 billion was to be paid on an agreed schedule: $600 million in 2019, and $600 million in 2020.

9.      In July 2018, for strategic reasons, the parties mutually agreed to amend the Transaction Agreements and accelerate Season Smart's investment payments to speed up the pace of manufacturing for the FF 91; Smart King was otherwise on schedule and under budget.  The first payment (of $300 million) was due on or about August 1, 2018.  The second payment of $200 million would have been due on October 31, 2018.

10.      The Merger Agreement and the SHA each include an arbitration clause; the Amendment specifically incorporates by reference the arbitration agreement contained in the SHA. The arbitration clause in the SHA states, in part:

> (a) Any dispute, controversy, difference or claim (each, a "Dispute") arising out of or relating to this Agreement, or the interpretation, performance, breach, termination, existence, validity or invalidity thereof, or any Dispute regarding non-contractual obligations arising out of or relating to it shall be referred to and finally resolved by arbitration administered by the Hong Kong International Arbitration Centre (the "HKIAC") under the HKIAC Administered Arbitration Rules (the "HKIAC Rules") in force when the notice of arbitration is submitted by one party to another.

(b) The law of this arbitration clause shall be Hong Kong law. The seat of arbitration shall be Hong Kong. The number of arbitrators shall be three (3). All of the arbitrators shall be qualified to practice law in Hong Kong. … (

d) The award of the arbitral tribunal shall be final and binding upon the parties thereto, and the prevailing party may apply to a court of competent jurisdiction for enforcement of such award.

(e) The arbitral tribunal shall decide any Dispute submitted by the parties to the arbitration strictly in accordance with the substantive Laws of Hong Kong, without regard to principles of conflict of laws thereunder, and shall not apply any other substantive Law.

(f) Any party to the Dispute shall be entitled to seek interim or conservatory relief either from an emergency arbitrator or any court of competent jurisdiction prior to the constitution of the arbitral tribunal, or from the arbitral tribunal or any court of competent jurisdiction once the arbitral tribunal has been constituted.

**Exhibit D**, § 16.6 (excerpted copy of the SHA). *See also* **Exhibit E** § 9.4 (excerpted copy of the Merger Agreement).

B.    **Season Smart Breaches and Renounces the Transaction Agreements.**

11.    Season Smart defaulted on its payment obligation per the Amendment in August 2018 and Smart King had no choice but to seek external financing to fund Faraday's operations.  But, under the Transaction Agreements, Season Smart has an approval right over any external capital fundraising – and Season Smart made it clear that it would not consent to any attempt by Smart King to obtain other financing.

12.    Season Smart's withholding of the funds appears to be purely tactical.  It is deliberately starving Smart King of the cash it needs to stay solvent.  It appears to be doing so either to push Smart King into bankruptcy (thereby avoiding its future payment obligations and/or allowing it to seize control of Smart King's valuable assets and intellectual property in a fire sale), or to force Smart King and the other counterparties to the Transaction Agreements to renegotiate those Agreements.

13.    Whatever Season Smart's motivations might be, the reality is that it has engineered a situation where, unless Smart King obtains an injection of substantial sums in the immediate future, it will become insolvent.  And Season Smart has closed off all avenues by which Smart King could obtain that financing.

14.     Accordingly, Season Smart has, by its conduct, evinced a clear intention not to be bound by the terms of its investment in Smart King.

15.     Smart King was therefore entitled to accept Season Smart's renunciation of the bargain.  Smart King terminated the Transaction Agreements by letter dated October 3, 2018.

C.     **Smart King Commences Arbitration and Files a Petition for Emergency Relief**

16.     On October 3, 2018, Smart King filed its Notice of Arbitration before the HKIAC, requesting, among other things, declaratory relief that Season Smart had renounced the Transaction Agreements and that Smart King was entitled to terminate, and did terminate, the Transaction Agreements.

17.     Concurrently on October 3, 2018, Smart King filed an application for emergency relief ("Emergency Application"), requesting an order that Season Smart be enjoined from asserting any of its purported consent rights under the Transaction Agreements that would allow it to effectively thwart Smart King's efforts at obtaining financing to continue operating.

18.     On October 4, 2018, the HKIAC accepted Smart King's Emergency Application and appointed Mr. Thorp as the emergency arbitrator the next day pursuant to its Emergency Arbitration Procedures.  Following a procedural teleconference on October 6, 2018, on October 8, 2018 Mr. Thorp issued Procedural Order No. 1.

19.     Season Smart filed its Response to the Emergency Application on October 12, 2018.  On the same day, Yueting Jia, the Second Respondent filed his Response to the Emergency Application supporting Smart King's application.  Smart King then filed its Reply on October 15, 2018.

D.     **The Award**

20.     An oral hearing was held in Hong Kong S.A.R. before Mr. Thorp on October 18, 2018.  All of the parties to the Notice of Arbitration and Emergency Application were represented at the hearing, and participated through counsel.

-4-

PETITION TO CONFIRM ARBITRATION AWARD

21.     On October 25, 2018, the HKIAC released the Award of the Emergency Arbitrator ("Award"), attached as **Exhibit A**, which it circulated to all of the parties. *See* **Exhibit F** (transmittal of the Award by the HKIAC).  The Award was granted in Smart King's favor and affirmed Smart King's right to seek alternative financing and that such financing would not be subject to Season Smart's purported consent. ¶206.

22.     The Award also ordered Season Smart to pay Smart King 75% of its attorneys' fees and costs, including administrative fees and costs of the emergency arbitration proceeding, totaling HKD 5,898,515.76.  ¶206.

23.     The Award was based on and included the following findings:

- "[T]he Emergency Arbitrator also should not accept at face value the assurances of Season Smart that that it is prepared to seriously consider any reasonable specific proposal to meet the funding needs of Smart King, particularly in light of Season Smart's particular insouciance in the face of an imminent inability to meet its immediate, let alone medium-term, spending obligations." ¶178.

- "Smart King has established a prima facie case that it has a reasonable possibility of succeeding on the merits in the present arbitration." ¶120(b).

- "Smart King needs the emergency relief on an urgent basis that cannot await the constitution of the arbitral tribunal in these arbitral proceedings." ¶120(c).

- "Harm not adequately reparable by an award of damages is likely to result if emergency relief is not ordered, and such harm substantially outweighs the harm that is likely to result to Season Smart if the emergency relief is granted." ¶120(d).

- "The emergency relief is necessary to maintain the status quo pending the determinations of the parties' disputes and is necessary to prevent any harm or prejudice to the arbitral process."  ¶120(e).

II.    **THE AWARD SHOULD BE CONFIRMED UNDER CHAPTER II OF THE FAA AND THE NEW YORK CONVENTION.**

A.    **The Convention Governs This Court's Review of the Award.**

24.    The Convention was drafted in 1958, "under the auspices of the United Nations.  The United States acceded to the treaty in 1970, and Chapter II of the FAA [9 U.S.C. § 201 *et seq.*, implementing the Convention] was passed that same year." *Indus. Risk Ins. v. M.A.N. Gutehoffnungshutte*, 141 F.3d 1434, 1440 (11th Cir. 1998).  Hong Kong S.A.R. is also a signatory to the New York convention.  *Tigra Tech. v. Techsport Ltd.*, No. SACV 10-1623 DOC, 2011 WL 2710678, at *2 (C.D. Cal. July 12, 2011

25.    FAA Section 201 states that "[t]he [Convention] shall be enforced in United States Courts in accordance with this chapter," and the Convention is codified as a note following this section.  9. U.S.C. § 201.  The principal purpose of the Convention is "to encourage the recognition and enforcement of international arbitral awards."  *Bergesen v. Joseph Muller Corp.*, 710  F.2d 928, 932 (2d Cir. 1983).

26.    An arbitral award is "international" and falls under the Convention if it (i) arises out of a legal relationship; (ii) that is commercial in nature; and (iii) is not entirely between citizens of the United States.  *See* 9 U.S.C. § 202.

27.    The first two requirements are clearly met here. The Transaction Agreements create a "legal relationship," the subject of which—a $2 billion investment in an electric vehicle company—is obviously commercial in nature.

28.    The third requirement is also clearly met here.  A corporation is considered a citizen of the United States under Chapter II of the FAA if it is incorporated or has its principal place of business in the United States.  *Id.*  Because Season Smart is a British Virgin Islands corporation with its principle place of business in Hong Kong S.A.R., it is not a citizen of the United States, and so the third requirement of Section 202 is also met.  Therefore, because the arbitration was not entirely between citizens of the United States and arose out of a legal relationship that was commercial in nature, the Convention governs judicial review of the Award.  *See Stone & Webster, Inc. v.*

*Triplefine Intern. Corp.*, 118 Fed.Appx. 546, 548-49 (2d Cir. 2004) (quoting *Yusef Ahmed Alghanim & Sons v. Toys "R" Us, Inc.*, 126 F.3d 15, 18-19 (2d Cir. 1997); *Jain v. de Mere*, 51 F.3d 686, 689 (7th Cir. 1995)); *Indus. Risk. Ins.*, 141 F.3d at 1441.

B.   **<u>Jurisdiction and Venue Are Proper In This Court.</u>**

29.   The FAA vests district courts with subject matter jurisdiction over "[a]n action or proceeding falling under the Convention . . .regardless of the amount in controversy." 9 U.S.C. § 203.

30.   The FAA further allows that any action over which the district courts have jurisdiction pursuant to Section 203 may be brought in the " . . . court in which save for the arbitration agreement an action or proceeding with respect to the controversy between the parties could be brought. . . ." *Id.* § 204.

31.   Save for the arbitration agreement, Smart King could have brought an action against Season Smart in this venue because Smart King's principal place of business is located in Los Angeles, and the Court can exercise specific personal jurisdiction over Season Smart in light of its minimum contacts in Los Angeles. These contacts include:

- travel by Season Smart's principals to Los Angeles on multiple occasions to conduct due diligence, engage in negotiations, and to monitor its investment in Smart King;

- the commitment to making a $2 billion investment in a Los Angeles-based company, and the actual payment of $800 million to date to a Los Angeles-based company;

- the exercise of control over Smart King's operations in Los Angeles through its proxies that sit on Smart King's board of directors and other employees it appointed to work as cashiers on-site at Smart King's offices in Los Angeles.

32.   The arbitration agreements also specifically contemplate that in the case of an award, "the prevailing party may apply to a court of competent jurisdiction for

-7-

enforcement of such award," and that "[a]ny party to the Dispute shall be entitled to seek interim or conservatory relief either from an emergency arbitrator or any court of competent jurisdiction."  **Exhibit D**, § 16.6; **Exhibit E** § 9.4.

33.    Therefore, both jurisdiction and venue are proper in this Court.

C.    **This Petition Is Timely Made, and Should Be Granted On Summary Review As Set Forth By the FAA and Convention.**

34.    The FAA also circumscribes the scope of a district court's review in confirming an arbitral award under the Convention.

35.    Specifically, Section 207 states that if an application for confirmation is made within three years of the grant of an arbitral award falling under the Convention, the "court ***shall*** confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in said Convention."  9 U.S.C. § 207 (emphasis added).

36.    Article V of the Convention delineates the seven grounds under which a court may refuse recognition and enforcement of an award, "***at the request of a party against whom it is invoked***."  Convention, Art. V (emphasis added).  In other words, under its plain language the Convention does not call for a court's *sua sponte* review, but rather, "[t]he party opposing enforcement of an arbitral award has the burden to prove that one of the seven defenses under the New York Convention applies.[1]"

---

[1]    The seven grounds listed in Article V of the Convention are specific and narrow, and are non-applicable to the award at hand.  These grounds are:

(1)(a) "The parties to the agreement . . . were, under the law applicable to them, under some incapacity, or the said agreement is not valid under the law to which the parties have subjected it or, failing any indication thereon, under the law of the country where the award was made;"

(1)(b) "The party against whom the award is invoked was not given proper notice of the appointment of the arbitrator or of the arbitration proceedings or was otherwise unable to present his case;"

(1)(c) "The award deals with a difference not contemplated or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration,

-8-

1  *Encyclopaedia Universalis S.A. v. Encyclopaedia Britannica, Inc.*, 402 F.3d 85, 90 (2d
2  Cir. 2005).

3      37.    In addition, these seven grounds are the exclusive grounds upon which a
4  court may refuse to recognize an arbitral award, and the "showing required to avoid
5  summary confirmance is high." *Id* (quoting *Yusuf Ahmed Alghanim*, 126 F. 3d at 23).
6  In fact, "[c]onfirmation under the Convention is a summary proceeding in nature . .
7  .[and a] district court confirming an arbitration award does little more than give the
8  award the force of a court order." *Zeiler v. Deitsch*, 500 F.3d 157, 169 (2d Cir. 2007)
9  (citations omitted).

10     38.    The scope of review of arbitral awards is purposefully very limited, in
11 order to support the strong public policy in favor of international arbitration and to
12 achieve the "twin goals of arbitration, namely, settling disputes efficiently and avoiding
13 long and expensive litigation." *Encyclopaedia Universalis S.A*, 402 F.3d at 90
14 (citations and quotations omitted).

15     39.    Therefore, because the scope of this Court's review is necessarily narrow,
16 and because the burden is on Season Smart to prove the applicability of any of the

17

18 _____

19         provided that, if the decisions on matters submitted to arbitration can be
20         separated from those not so submitted, that part of the award which
           contains decisions on matters submitted to arbitration may be
           recognized and enforced;"

21         (1)(d) "The composition of the arbitral authority or the arbitral
22         procedure was not in accordance with the agreement of the parties, or,
           failing such agreement, was not in accordance with the law of the
23         country where the arbitration took place."

24         (1)(e) "The award has not yet become binding on the parties, or has
25         been set aside or suspended by a competent authority of the country in
           which, or under the law of which, that award was made;"

26         (2)(a) "The subject matter of the difference is not capable of settlement
           by arbitration under the law of that country;" or

27
           (2)(b) "The recognition or enforcement of the award would be contrary to the
28 public        policy of that country."

PETITION TO CONFIRM ARBITRATION AWARD

factors listed in Article V of the Convention, this Court should confirm the Award in its entirety.

## III.    **CONCLUSION AND PRAYER FOR RELIEF**

40.    Based on the foregoing, Smart King respectfully requests the following relief:

A. That an order confirming the award as against Season Smart be made;

B. That a judgment be entered in conformity with such order;

C. That Smart King be allowed its costs incurred in this proceeding; and

D. That Smart King be awarded such other and further relief as may be proper.

DATED:  November 8, 2018          QUINN EMANUEL URQUHART &
                                 SULLIVAN, LLP


By   */s/ R. Brian Timmons*
                                 R. Brian Timmons
                                 Lee J. Rosenberg

                                 Attorneys for Petitioner
                                 Smart King Ltd.

# EXHIBIT A

**IN THE MATTER OF AN APPLICATION UNDER THE EMERGENCY ARBITRATION
PROCEDURES SET OUT IN SCHEDULE 4 OF THE HONG KONG
INTERNATIONAL ARBITRATION CENTRE
2013 ADMINISTERED ARBITRATION RULES**

**ARBITRATION CASE NO. HKIAC/A18176**

BETWEEN:

**SMART KING LTD.**                                                              **CLAIMANT**

- AND -

**(1) SEASON SMART LIMITED**

**(2) YUETING JIA**                                                              **RESPONDENTS**

—————————————————————————————————

**AWARD OF EMERGENCY ARBITRATOR**

—————————————————————————————————

**Dated 25 October 2018**

**The Emergency Arbitrator:**

**Peter Thorp**

| I.    | INTRODUCTION                                                        | 2  |
|-------|--------------------------------------------------------------------|----|
| II.   | THE PARTIES                                                         | 3  |
| III.  | THE ARBITRATION AGREEMENT, APPLICABLE LAW AND SEAT OF ARBITRATION   | 4  |
| IV.   | PROCEDURAL HISTORY                                                  | 5  |
| V.    | FACTUAL BACKGROUND                                                  | 7  |
| VI.   | THE PARTIES' REQUESTS FOR RELIEF                                    | 16 |
| VII.  | EMERGENCY ARBITRATOR'S ANALYSIS AND FINDINGS                       | 19 |
| VIII. | SUMMARY OF EMERGENCY ARBITRATOR'S FINDINGS                         | 42 |
| IX.   | COSTS                                                               | 43 |
| X.    | OPERATIVE PART                                                      | 45 |

## I.    INTRODUCTION

1.    This arbitration involves a dispute between the Claimant, Smart King Limited (***Smart King***), First Respondent Season Smart Limited (***Season Smart***) and Second Respondent Mr Yueting Jia (***Mr Jia***) in relation to a series of agreements entered into by those parties and related entities for the principal purpose of investing in a project to bring to market a revolutionary electronic vehicle called the FF 91, which is being developed and manufactured by Smart King's California-based indirect subsidiary Faraday & Future Inc. (***Faraday***).

2.    In November 2017, Season Smart agreed to invest US$2 billion in the project, to be paid in stages. To formalise the transaction, Mr Jia, Season Smart, Smart King and various related entities entered into a series of interrelated agreements, including an Agreement and Plan of Merger and Subscription (***Merger Agreement***), as amended, a Shareholders Agreement (***SHA***), as amended, including most recently by the Amendment and Consent (***A&C*** or ***Amendment***) entered into on 18 July 2018, pledge agreements, security agreements, and an intellectual property security agreement (together, the ***Transaction Agreements***).

3.    Season Smart has paid in capital to Smart King of US$800 million to date.   The remainder US$1.2 billion was to be paid in accordance with an agreed schedule: US$600 million in 2019 and US$600 million in 2020 (***Subscription Payments***). In exchange for its promised investments in Smart King, Season Smart was allotted Class A Preferred Shares in Smart King and became a 45% shareholder of Smart King.

4.    According to the A&C, Season Smart agreed to amend the Transaction Agreements and inject monies into Smart King on an accelerated timetable subject to certain conditions being fulfilled by Smart King.

5.    Smart King alleges that Season Smart has defaulted on the first US$300 million payment due on 31 July 2018 under the accelerated schedule set out in the A&C (***Accelerated Payments***), and that Season Smart has also withheld approval for Smart King to seek external financing, either with the aim of pushing Smart King into bankruptcy (thereby avoiding its future payment obligations and/or allowing it to seize control of Smart King's assets in a fire sale), or to force Smart King and other counterparties to renegotiate their agreements in Season Smart's favour.

6.    Season Smart denies Smart King's accusations and says it stands ready to provide its committed investments into Smart King as soon as Smart King satisfies the conditions that Smart King is obliged to meet under the A&C in return for those investments.

7.    Smart King filed a Notice of Arbitration on 3 October 2018 (***NOA***) with the Hong Kong International Arbitration Centre (***HKIAC***) against Season Smart and Mr Jia, seeking, inter alia, declarations that Smart King had fulfilled the conditions necessary for Season Smart to make its Accelerated Payments, that Season Smart had accordingly breached and renounced the A&C and the other Transaction Agreements, that Smart King was entitled to terminate, and had validly terminated, the Transaction Agreements, and that Season Smart's rights, including its rights regarding consent for financing under the Transaction Agreements, were no longer of any effect. Smart King also seeks damages in an amount to be determined, including its costs of seeking alternative financing.

8.    Concurrently with the NOA, Smart King also filed, in accordance with the Emergency Arbitrator Procedures set out in Schedule 4 of the HKIAC 2013 Administered

Arbitration Rules (**HKIAC Rules**), an Application for the Appointment of an Emergency Arbitrator to consider Smart King's application for emergency relief (**Emergency Relief**) that Smart King argues cannot await the formation of the arbitral tribunal (**Tribunal**) to be appointed to consider the merits of Smart King's claims as set out in the NOA (**Application**). In the Application, Smart King requested an order from the Emergency Arbitrator enjoining Season Smart from asserting any of its consent rights (or withholding approval) in respect of alternative financing necessary to meet Smart King's ongoing capital needs and to enable production and delivery of the FF 91 in 2019. In exchange, Smart King offered to provide certain undertakings aimed at protecting the value of Season Smart's investment in Smart King. The requested order and undertakings were amended by Smart King on 19 October 2018.

## II.    THE PARTIES

### The Claimant

9.    The Claimant Smart King is an exempted company with limited liability incorporated under the Laws of the Cayman Islands. The Claimant's registered office is at the offices of Walkers Corporate Limited, Cayman Corporate Centre, 27 Hospital Road, George Town, Grand Cayman KY1-9008, Cayman Islands.

10.   The Claimant is represented in these proceedings by Quinn Emanuel Urquhart & Sullivan, LLP (**Quinn Emanuel**), whose contact details are as follows:

> John Rhie
> Duncan Watson
> Nathaniel Lai
> Tom Brebner
> James Chun
> 1307-08 Two Exchange Square
> 8 Connaught Place, Central
> Hong Kong
> Tel: +852 3464 5600
> Fax: +852 3464 5700
> johnrhie@quinnemanuel.com
> duncanwatson@quinnemanuel.com
> nathaniellai@quinnemanuel.com
> tombrebner@quinnemanuel.com
> jameschun@quinnemanuel.com

### The Respondents

11.   The First Respondent, Season Smart, is a company organised under the laws of the British Virgin Islands, with its registered office is at the offices of Vistra Corporate Services Centre, Wickhams Cay II, Road Town, Tortola, VG1110, British Virgin Islands. Season Smart is a direct or indirect wholly-owned subsidiary of Evergrande Health Industry Group Ltd. (**Evergrande**), a Hong Kong-based investment holding company principally engaged in media and healthcare businesses.

12.   The First Respondent is represented in these proceedings by Baker & McKenzie LLP (**Baker McKenzie**), whose contact details are as follows:

> Lawrence Lee
> Anthony Poon
> Roberta Chan
> Yvette Yu

3

Miranda Lee
Brian Wong
14th Floor, Hutchison House
10 Harcourt Rd, Central,
Hong Kong
Tel: +852 2846 1888
Fax: +852 2845 0476
lawrence.lee@bakermckenzie.com
anthony.poon@bakermckenzie.com
roberta.chan@bakermckenzie.com
yvette.yu@bakermckenzie.com
miranda.lee@bakermckenzie.com
briankt.wong@bakermckenzie.com

13.   The First Respondent is also represented in these proceedings by counsel Benjamin Yu SC, Paul Shieh SC, Eva Sit, Harrison Miao and Jennifer Fan.

14.   The Second Respondent, Mr Jia, is an individual and the founder of Faraday.  Pursuant to Schedule III of the SHA, Mr Jia's address for notification purposes is 7 Marguerite Drive, Rancho Palos Verdes, California, USA, email: yt@ff.com.

15.   The Second Respondent is represented in these proceedings by Latham & Watkins LLP, whose contact details are as follows:

Ing Loong Yang
Chi Ho Kwan
18th Floor, One Exchange Square
8 Connaught Place, Central
Hong Kong
Tel: +852 2912 2500
Fax: +852 2912 2600
Ingloong.Yang@lw.com
ChiHo.Kwan@lw.com

16.   The Second Respondent is also represented in these proceedings by counsel Elizabeth Cheung.

17.   Each of the Claimant, the First Respondent and the Second Respondent are referred to hereafter individually as a **Party** and collectively from time to time as the **Parties**.  Depending on the context, the term Party or Parties may also be used from time to time to refer to a party or parties to any one or more of the Transaction Agreements.

## III.   THE ARBITRATION AGREEMENT, APPLICABLE LAW AND SEAT OF ARBITRATION

18.   The relevant agreement is set out in Section 16.6 of the SHA, which provides as follows:

16.6: Dispute Resolution

(a)   Any dispute, controversy, difference or claim (each, a "Dispute") arising out of or relating to this Agreement, or the interpretation, performance, breach, termination, existence, validity or invalidity thereof, or any Dispute regarding non-contractual obligations arising out of or relating to it shall be referred to and finally resolved by arbitration administered by the Hong Kong International Arbitration Centre (the "HKIAC") under the HKIAC Administered Arbitration Rules (the "HKIAC Rules") in force when the notice of arbitration is submitted by one party to another.

(b)   The law of this arbitration clause shall be Hong Kong law.  The seat of arbitration shall be Hong Kong.  The number of arbitrators shall be three (3).  All of the arbitrators shall be qualified to practice law in Hong Kong.

(c)   The arbitration proceedings shall be conducted in English and Mandarin.  To the extent that the HKIAC Rules are in conflict with the provisions of this Section 16.6, including the provisions concerning the appointment of the arbitrators, the provisions of this Section 16.6 shall prevail.

(d)   The award of the arbitral tribunal shall be final and binding upon the parties thereto, and the prevailing party may apply to a court of competent jurisdiction for enforcement of such award.

(e)   The arbitral tribunal shall decide any Dispute submitted by the parties to the arbitration strictly in accordance with the substantive Laws of Hong Kong, without regard to principles of conflict of laws thereunder, and shall not apply any other substantive Law.

(f)   Any party to the Dispute shall be entitled to seek interim or conservatory relief either from an emergency arbitrator or any court of competent jurisdiction prior to the constitution of the arbitral tribunal, or from the arbitral tribunal or any court of competent jurisdiction once the arbitral tribunal has been constituted.

(g)   During the course of the arbitral tribunal's adjudication of the Dispute, this Agreement shall continue to be performed.[1]

19.   Pursuant to Section 16.6(b) of the SHA, the Parties agreed that the seat of arbitration shall be Hong Kong. Pursuant to paragraph 10 of Schedule 4 of the HKIAC Rules, the seat of these Emergency Relief proceedings is accordingly also Hong Kong.

20.   Pursuant to Section 16.6(e) of the SHA, the Parties agreed that the substantive law governing any dispute arising out of the SHA (and the Amendment) would be Hong Kong law.  The law applicable to the Emergency Relief proceedings is accordingly Hong Kong law.

21.   This is also confirmed in the A&C, Section 12 of which provides as follows:

> **Governing Law and Jurisdiction**. This Amendment and Consent shall be governed by, and construed in accordance with, the laws of Hong Kong, regardless of the laws that might otherwise govern under applicable principles of conflicts of laws thereof. The provisions of Section 16.6 of the SHA shall apply, mutatis mutandis, to this Amendment and Consent as if incorporated in full herein.

## IV.   PROCEDURAL HISTORY

22.   On 3 October 2018, Smart King filed the NOA concurrently with the Application, together with factual exhibits, legal authorities and the factual witness statements of Mr Michael Agosta and Mr Jerry Wang. In the NOA, Smart King applied for the arbitration to be conducted in accordance with the Expedited Procedure set out in Article 41 of the HKIAC Rules.

23.   On 4 October 2018, the HKIAC wrote to the Parties, advising that it had received the Application on 3 October 2108, that the HKIAC had decided to accept the Application

---

[1]        SHA, 30 November 2017, **C-3**, Section 16.6.

and that, accordingly, the HKIAC would proceed to appoint an Emergency Arbitrator within two days after receiving the Application, i.e., by 5 October 2018.

24. On 5 October 2018, the HKIAC advised the Parties by letter that it had appointed that day Mr Peter Thorp of 29 rue Louis Blanc, 75010 Paris, France as the Emergency Arbitrator in these proceedings pursuant to paragraph 5 of the Emergency Arbitrator Procedures and transferred the file to the Emergency Arbitrator.

25. On 6 October 2018, the Emergency Arbitrator convened a telephone conference with counsel for the Parties to discuss and determine the procedure for the hearing of the Application.

26. On 8 October 2018, the Emergency Arbitrator issued Procedural Order No.1, setting out the procedure and timetable for the hearing of the Application. In particular, it was agreed by the Parties, and confirmed in Procedural Order No.1, that all pleadings, hearings and awards in these Emergency Relief proceedings would be in English only.

27. On 12 October 2018, the Season Smart submitted its Response of the 1st Respondent to Application for Emergency Arbitrator (**Response**), together with factual exhibits, legal authorities and a factual witness statement of Mr Jianjun Peng. On the same day, Mr Jia submitted his 2nd Respondent's Response to the Claimant's Application for Appointment of Emergency Arbitrator (**Second Respondent's Response**).

28. On 15 October 2018, Smart King submitted its Claimant's Reply to Respondents' Responses to Application for Appointment of Emergency Arbitrator (**Reply**).

29. On 17 October 2018, in response to a list of questions sent earlier in the day by the Emergency Arbitrator to the Parties, the First Respondent submitted a Second Witness Statement of Jianjun Peng and an additional factual exhibit (R1-15).

30. On 18 October 2018, an oral hearing (**Hearing**) of Smart King's Application was held at the HKIAC. In attendance at the Hearing were the Emergency Arbitrator and the following representatives of the Parties: for the Claimant, John Rhie, Duncan Watson, Tom Brebner, Brian Timmons, Xiao Liu, Nathaniel Lai, James Chun and Harry Wong, all of Quinn Emanuel; for the First Respondent, counsel Benjamin Yu SC, Paul Shieh SC, Eva Sit, Harrison Miao and Jennifer Fan, as well as the Baker McKenzie team of Lawrence Lee, Yvette Yu, Roberta Chan, Brian Wong, Angel Cheng, Anthony Poon, Miranda Lee and Sze Shing Tan, as well as client representatives Jimmy Fong and Min Chen; and for the Second Respondent Daniel Schecter, Chi Ho Kwan and Sam Wong from Latham & Watkins.

31. At the Hearing, the Parties agreed, pursuant to Article 12 of the Emergency Arbitrator Procedures, that in view of the personal circumstances explained by the Emergency Arbitrator, the deadline for issuance of this Award would be extended from the originally agreed date of 22 October 2018 until 25 October 2018.

32. On the morning of 18 October 2018, just before the Hearing, Smart King submitted by email an urgent new application (**New Application**) for an order that Season Smart release its security over the Collateral (as defined by the Security Agreement dated 1 December 2017[2]) of the business so as to permit third party financial institutions to take security for debt financing. The New Application was discussed briefly at the beginning

---

[2]     **R1-6(4)**, p.2.

of the Hearing, after which the Emergency Arbitrator set a timetable for exchange of submissions on the New Application.

33. On 19 October 2018, Season Smart submitted its Response of the 1st Respondent to Claimant's New Application for Release of Security.

34. Also on 19 October 2018, Smart King submitted, as directed by the Emergency Arbitrator at the Hearing, a revised draft order including undertakings as an alternative to the draft order and undertakings that were set out at paragraphs 169 and 170 of the Application (**Revised Request**). Smart King provided in the Revised Request three draft order options for the Emergency Arbitrator's consideration.

35. On 20 October 2018, Smart King submitted its Claimant's Reply to Response of the 1st Respondent to Claimant's New Application for Release of Security.

36. On 22 October 2018, the Emergency Arbitrator issued his decision dismissing the New Application, and advising that if Smart King wanted to pursue the relief sought in the New Application, it would need to do that in separate proceedings, for example by filing a fresh application for Emergency Relief.

37. On 22 October 2018, Season Smart submitted its Response of the 1st Respondent to Claimant's Revised Proposed Preliminary Relief (**Response to Revised Request**).

38. On 23 October 2018, Smart King submitted, at the invitation of the Emergency Arbitrator, its reply to the proposals set out in paragraph 16 of Season Smart's Response to Revised Request.

39. On 23 October 2018, Smart King submitted its Claimant's Submissions as to Costs, Season Smart submitted its Costs Submissions of the 1st Respondent, and Mr Jia submitted his costs submissions in email form. On the same day, Mr Jia submitted a letter supporting Smart King's Revised Request.

40. The following conventions shall be adopted in this Award: (1) references to written submissions shall be to document name and page or paragraph number; (2) references to exhibits shall be to the letter "C" plus exhibit number for the Claimant's exhibits and "R1" plus exhibit number for the First Respondent's exhibits; and (3) references to the Hearing transcript shall be by page and line ("T_/_").

## V. FACTUAL BACKGROUND

41. The facts relating to the Parties' disputes are complex. The following provides a brief summary of the key facts for purposes of background only.

42. Mr Jia, the Second Respondent, is a Chinese entrepreneur and businessman who has, over the last two decades, set up a number of technology related companies, including Leshi Internet Information & Technology, one of the first companies in China to offer video streaming services, and LeEco, a Chinese corporation with ventures in, among other things, online video streaming, consumer electronics, and electric vehicles.

43. In 2014, Mr Jia established and invested US$500 million in his new company Faraday. Faraday's business was to develop, manufacture and sell intelligent electric vehicles (the **Business**). Faraday has its headquarters in Los Angeles and is currently working on the development for market of an electric vehicle called the FF 91.

44. In early July 2017, it was announced that the Shanghai High People's Court had frozen US$182 million in assets associated with Mr Jia after one of LeEco's affiliates missed its loan payments.[3] In December 2017, because the outstanding debt issues had not been resolved, further assets were seized, and Mr Jia was placed on a China's judgment debtors blacklist and ordered to return to China from the U.S. to satisfy LeEco's debts. As a consequence of Mr Jia's status on China's judgment debtor list, the Chinese Government also froze the foreign exchange accounts in China of Faraday's China operations.

45. During 2017, Faraday began the process of searching for a Series A investor to fund its ongoing operations and to ramp up for manufacturing to bring the FF 91 to market.

46. In November 2017, the First Respondent Season Smart agreed to invest US$2 billion in Faraday over several years in exchange for equity that valued the Company at approximately US$4.4 billion on an implied basis.  To formalise the transaction, the Parties entered into the Transaction Agreements referred to above.

47. Season Smart's investment in Faraday was designed as a reverse triangular merger and resulted in a complete reorganisation of Faraday's ownership structure.[4]  The deal led to the creation of Smart King, referred to in the Merger Agreement as "NewCo", shares of which were distributed to Season Smart (45%), Mr Jia's holding company FF Top Holding Ltd (**FF Top**) (33%), and Faraday's equity incentive program for employees (22%).[5]  Smart King's wholly-owned subsidiary, "MergerSub", was then merged into the existing business entity then known as FF Global Holdings Ltd. (now known as Smart Technology Holdings Ltd.), an exempted company limited by shares incorporated under the laws of the Cayman Islands and the indirect sole owner of Faraday, resulting in Smart King's 100% ownership of the Business of Faraday.[6]

48. The agreement between Season Smart, the existing shareholders of the Business and the holding entities of the Business was recorded in a series of documents dated 30 November 2017, as amended, restated and supplemented from time to time, including the Merger Agreement,[7] the SHA,[8] pledge agreements, security agreements, and an intellectual property security agreement (i.e., the Transaction Agreements, which also includes the A&C for all such purposes as the term is used to describe the Parties' rights and obligations after 18 July 2018).

49. The board of directors of Smart King (**Board**) has seven directors, five nominated by Mr Jia (through FF Top) and two by Season Smart.[9] Although Season Smart is not a majority shareholder of Smart King, the SHA vested Season Smart with certain consent rights over Faraday's financial operations, in particular granting Season Smart a level of control over Smart King's ability to secure future capital.  According to Section 8 of the SHA and the list of Reserved Matters set out in Schedule II of the SHA, Season Smart's consent was required before Smart King could issue "any Equity Securities or debt securities," and before Smart King could initiate an initial public offering:

---

3   The New York Times, "Court Freezes $182 Million in Assets of Chinese Internet Tycoon", **C-26**.
4   Merger Agreement, **C-30**, Section 1.2.
5   Merger Agreement, **C-30**, Section 1.1; FF Global Pro Forma Cap Table, undated, **C-75**.
6   Merger Agreement, **C-30**, Section 1.2.
7   Merger Agreement, **C-30**.
8   SHA, **C-3**.
9   Merger Agreement, **C-30**, Section 1.8(b); SHA, **C-3**, Section 6.1(a); Smart King Articles of Association, **C-80**, Article 41.1.

> [T]he Company . . . and/or its board of directors shall not, at any time
> on or after the First Closing and thereafter, do or approve any of the
> matters set forth in Schedule II (Reserved Matters), in each case
> without the prior approval in writing of the Majority Class A Preferred
> Shareholder or a Series A Director. As a separate and independent
> covenant, the Company agrees that it shall (so far as it is legally able
> to do so) observe and comply with the provisions, prohibitions and
> restrictions in this Section 8.[10]

> * * *

> **SCHEDULE II**

> * * *

> (b) Approve any annual budget and business plan other than those
> relating to the Business;
>
> (c) Issue, repurchase or redeem (or agree to issue, repurchase or
> redeem) any Equity Securities or debt securities or amend the rights
> attaching to any Equity Securities or debt securities, or undertake any
> consolidation, sub-division, reclassification or conversion of any of its
> share capital, except:
>
> > (i)   an issuance of Equity Securities following a failure to
> > make a Subscription Payment (as defined in the
> > Subscription Agreement);
>
> . . . .
>
> (i) Implement any IPO.[11]

50. In the SHA, Season Smart also acknowledged and agreed that it had the financial
obligation to make the Subscription Payments as set forth in the Merger Agreement,
and that any further "financial obligations or obligation to provide any capital
contribution or loan" in connection with the SHA would be subject to a future signed
written agreement by the Parties.[12] Pursuant to the Merger Agreement, the number of
shares issued to Season Smart would be reduced on a pro rata basis in the event that
Season Smart failed to make any of the Subscription Payments.[13]

51. The Parties agreed that Season Smart's investment of US$2 billion would be made by
a series of Subscription Payments, initially set out in Section 5.12 of the Merger
Agreement. The Subscription Payment schedule was amended a number of times,[14]
most recently in the A&C, and currently stands as follows:

---

[10]   SHA, **C-3**, Section 8.

[11]   SHA, **C-3**, Schedule II(c),(i).

[12]   SHA, **C-3**, Section 9.3.

[13]   Merger Agreement, **C-30**, Section 5.12(d).

[14]   First Amendment to Agreement and Plan of Merger and Subscription, 9 February 2018, **C-31**, (*First Amendment*) Section 1.3 (amending Section 5.12(a)(ii)); Second Amendment to Agreement and Plan of Merger and Subscription, 23 May 2018, **C-32**, (*Second Amendment*) Section 1.1 (amending Section 5.12(a)(ii)).

| DATE | AMOUNT (US$, m) |
|------|-----------------|
| 30.11.17 | 300[15] |
| 10.02.18 | 250 |
| 30.04.18 | 50 |
| 25.05.18 | 200 |
| 28.02.19 | 100 (Accelerated Payment due on 31.07.18 under the A&C) |
| 30.04.19 | 100 (Accelerated Payment due on 31.07.18 under the A&C) |
| 30.06.19 | 100 (Accelerated Payment due on 31.07.18 under the A&C) |
| 30.08.19 | 100 (Accelerated Payment due on 31.10.18 under the A&C) |
| 31.10.19 | 100 (Accelerated Payment due on 31.10.18 under the A&C) |
| 31.12.19 | 100 (Accelerated Payment due on 31.01.19 under the A&C) |
| 29.02.20 | 100 (Accelerated Payment due on 31.01.19 under the A&C) |
| 30.04.20 | 100 |
| 30.06.20 | 100 |
| 30.08.20 | 100 |
| 31.10.20 | 100 |
| 31.12.20 | 100 |

52. The First Respondent made all Subscription Payments due up to and including the payment of US$200 million on 25 May 2018. Season Smart's next Subscription Payment under the Merger Agreement, in the amount of US$100 million, was not due until February 2019, followed by eleven additional payments of US$100 million every two months.

---

[15]   Second Amendment, 23 May 2018, **C-32**, Section 1.1 (amending Section 5.12(a)(ii)).

53. As of July 2018, Faraday projected that it would need approximately US$663 million in cash between August 2018 and December 2018 to meet the goal of commencing manufacture of the FF 91 by December 2018.[16] Accordingly, Season Smart was requested to provide some of its promised funding sooner than the next scheduled Subscription Payment.

54. The Parties entered into the A&C on 18 July 2018,[17] which, inter alia, memorialised the Parties' agreement to accelerate Season Smart's Subscription Payments according to the following schedule (the Accelerated Payments):

| DATE | AMOUNT (US$, m) |
|---|---|
| 31.07.18 | 300 |
| 31.10.18 | 200 |
| 31.01.19 | 200 |

55. The Accelerated Payments could take the form of debt financing or capital contributions at Season Smart's election. If they took the form of loans, Smart King agreed to repay Season Smart "when there is sufficient funding for such repayment after taking into account the normal operational requirements of the Business in the PRC".[18] If the loan monies were outstanding when a Subscription Payment fell due, then: i) the loan monies would be deemed to be capital contributions (to the extent available and necessary to meet the Subscription Payment); and ii) the loan would be deemed to be discharged in the amount deemed to be contributed as capital.[19] In exchange for acceleration of the Subscription Payments, Season Smart asked for greater control over Faraday's Chinese operations (*Faraday China*). The Parties agreed to allow Season Smart to appoint the leadership for Faraday's operations in the PRC – the chairman (*FF China Chairman*) and the legal representative (*FF China Legal Representative*).[20] The Parties also agreed to change the names of Faraday's Chinese companies to include the word "Evergrande".[21]

56. Season Smart also stated that it wanted to make certain structural changes to Mr Jia's corporate control over Faraday China.[22] The Transaction Agreements were accordingly amended to create a certain distance between Mr Jia and Faraday's Chinese operations.[23] The Parties agreed that Mr Jia would take two steps to achieve that purpose. Those two steps are referred to as the *FF Principal Transfer Requirement* and the *FF Principal Director Requirement*. The specific terms relating to the FF Principal Transfer Requirement and the FF Principal Director Requirement are set out in Sections 3 and 4 of the A&C, the full text of which is set out below:

---

16   Agosta WS, [21].
17   A&C, **C-2**.
18   A&C, **C-2**, Section 2(a)(iii).
19   A&C, **C-2**, Section 2(a)(iv).
20   A&C, **C-2**, Section 1(b).
21   A&C, **C-2**, Section 6 and Exhibit C.
22   Wang WS, [13].
23   Wang WS, [16]-[18].

11

### 3. Transfer of Founder's Shareholding in Founder TopCo.

(a) For purposes of SHA, including, but not limited to, Section 4 and Section 12 of the SHA, the Parties hereby waive the Founder's observance thereof with respect to, and gives written approval to, transfers directly or indirectly of any interests in Equity Securities of Founder TopCo solely to and from one identified non-affiliated third-party acceptable to [Season Smart] (the **"Accepted Third Party"**) and the Founder, provided that there shall only be a single transfer by the Founder directly or indirectly of 100% of his shareholding in Founder TopCo to the Accepted Third Party and a single transfer of such 100% shareholding in Founder TopCo from such Accepted Third Party back to the Founder permitted under this Section 3(a).

(b) Founder shall, within 30 days of the date of this Amendment and Consent, use best efforts to: (i) transfer, directly or indirectly, all of Founder's shares in Founder TopCo to the Accepted Third Party; and (ii) provide evidence satisfactory to [Season Smart] (A) of such transfer; (B) that Founder is not the ultimate controlling shareholder (实际控制人) of the Founder TopCo following such transfer in such form that is satisfactory to [Season Smart] (taking into account relevant Governmental Authorities and financial institutions requirements); and (C) that a deed of adherence in the form set out in Exhibit B has been duly executed by the Accepted Third Party effective from the date of such transfer whereby the Accepted Third Party agrees to be bound by the SHA as if the Accepted Third Party is also the "Founder" under the SHA to perform (and solely to perform) the Founder's obligations under the SHA (such deed of adherence, the **"Deed of Adherence"** and the completion of the transfer and the provision of all the evidence specified in this Section 3(b) being the **"FF Principal Transfer Requirement"**).

(c) Following the transfer pursuant to Section 3(b) and the due execution of the Deed of Adherence by the Accepted Third Party:

(i) all rights of Founder under the SHA (including under Sections 4.2(b)(ii), 6.7 and 10.3(b) of the SHA) shall remain the rights of Mr. Yueting Jia and shall continue to be enjoyed solely by Mr. Jia Yueting in his capacity as Founder; and

(ii) none of Mr. Yueting Jia's obligations as Founder under the SHA (including under Sections 10.2, 10.11, 11, 12 and 13 of the SHA) and, for the avoidance of doubt, none of Mr. Yueting Jia's obligations under the Merger Agreement or any other agreements entered in connection with the Merger Agreement (as applicable), shall be affected in any respect.

(d) Founder and [FF Top Holding Ltd.] shall, following the satisfaction of the FF Principal Transfer Requirement, from time to time at the request of [Season Smart], provide evidence satisfactory to [Season Smart] of (i) the transfer, directly or indirectly, of all of Founder's shares in Founder TopCo to the

Accepted Third Party; and (ii) that Founder is not the ultimate controlling shareholder (实际控制人) of the Founder TopCo.

(e) Following the transfer, directly or indirectly, of the Founder's shares in Founder TopCo to the Accepted Third Party and the due execution of the Deed of Adherence by the Accepted Third Party:

    (i)    reference to "Founder" in the definition of "Founder Entity" in the SHA shall mean "the Accepted Third Party" and reference to "Founder" in the definition of "Relevant Date" shall mean "Mr Yueting Jia and the Accepted Third Party together"; and

    (ii)    reference to "Founder" in Section 12.1(a) of the SHA shall mean "Mr Yueting Jia and/or (to the extent the Accepted Third Party owns any interest in Equity Securities of the Founder Entities or the Group or would have owned such interest but for a transfer in breach of the provisions of the SHA) the Accepted Third Party", references to "Founder" in Section 12.1(b) and (c) shall mean Mr Yueting Jia and reference to "Founder" in Section 12.1(d) shall mean "Mr Yueting Jia and the Accepted Third Party together".

(f) Notwithstanding anything to the contrary set forth in this Amendment and Consent, Sections 3(a) and (b) shall take effect as of the date of this Amendment and Consent.

**4.  Directors of Founder Entities and Group Companies.**

(a)    The parties hereto hereby agree that Mr. Yueting Jia shall not serve as a director of any of the Founder Entities and Group Companies and shall not serve as the vice chairman of the Board of the Company.

(b)    Mr. Yueting Jia shall resign as a director of each of the Founder Entities, the Company and each other Group Company (to the extent he is a director) and as vice chairman of the Board as soon as reasonably practicable after the date of this Amendment and Consent. Founder shall provide evidence satisfactory to [Season Smart] that he is not the director of any Founder Entity or Group Company and is not the vice chairman of the Board promptly after effecting the relevant resignations under this Section 4(b) (all the obligations under this Section 4(b), the "**FF Principal Director Requirement**").

(c)    Founder and [FF Top Holding Ltd.] shall, from time to time after the date of this Amendment and Consent, at the request of [Season Smart], provide evidence satisfactory to [Season Smart] that Founder is not the director of any Founder Entity or Group Company or the vice chairman of the Board at such time.

(d)    Notwithstanding anything to the contrary set forth in this Amendment and Consent, Section 4(b) shall take effect as of the date of this Amendment and Consent.

57.   In summary, the FF Principal Transfer Requirement obligated Mr Jia (as the **Founder**) to transfer all of his shares in the company holding his legal interest in Faraday – FF Peak Holding Ltd (**Founder TopCo**) – according to the following steps:

   a.   transfer by Mr Jia of his shares in Founder TopCo to an "Accepted Third Party";

   b.   provision of evidence satisfactory to Season Smart:

      i.   that such transfer had been made;

      ii.  that Mr Jia was not the ultimate controlling shareholder (实际控制人) of Founder TopCo following such transfer in such form satisfactory to Season Smart (taking into account relevant Governmental Authorities and financial institutions requirements); and

      iii. that a deed of adherence had been executed by the Accepted Third Party binding it to the SHA.[24]

58.   The FF Principal Director Requirement required Mr Jia to resign as a director from Smart King and its subsidiaries, and to provide evidence satisfactory to Season Smart of this.[25] The A&C also provided that, following the transfer and execution of the deed of adherence pursuant to Section 3(b), Mr Jia would retain all of his rights of Founder under the SHA and all of his obligations under the SHA and the Merger Agreement.[26]

59.   On 26 July 2018, Mr Jia resigned as a director of each of Founder TopCo, FF Top Holding Ltd, Smart King and each subsidiary of Smart King (to the extent he was a director) and as vice chairman of the Board.[27] On 28 July 2018, Mr Jia completed the transfer of his shares in Founder TopCo to a third-party, Lian Bossert, a friend of Mr Jia.[28]

60.   On 6 August 2018, Season Smart requested the appointment of Mr Jianjun Peng as the FF China Chairman and the FF China Legal Representative.[29] Smart King duly appointed Mr Peng to these positions.

61.   Season Smart did not make the Accelerated Payment of US$300 million to Smart King due on 31 July 2018, and to date has still not made that payment. On 21 August 2018, Sidley Austin LLP (**Sidley Austin**), counsel for Smart King, contacted Baker McKenzie by email to schedule "a call to discuss Season Smart's failure to fund Smart King as required under the Amendment and Consent after all closing requirements have been satisfied (as FF has provided all required documents, and evidenced by Evergrande's appointment and announcement of the FF China Chairman afterwards)."[30]

---

24   A&C, **C-2**, Section 3(b).
25   A&C, **C-2**, Section 4(b).
26   A&C, **C-2**, Section 3(c).
27   FF China List of Directors, 9 August 2018, **C-33**; FF US Entities List of Directors; 28 July 2018, **C-34**; FF Peak Holding Limited Director's Written Resolutions, 26 July 2018, **C-35**; FF Top Holding Ltd. Director's Written Resolutions, 26 July 2018, **C-36**; Smart King Limited Written Notice of Removal of director by FF Top Holding Limited, In Accordance With Article 41.1(A) of The Articles, 26 July 2018, **C-37**.
28   Deed of Adherence, **C-38**.
29   Email chain between Feifei Bian and Jerry Wang and others, 6 August 2018, **C-53**; Written Notice of Appointment of FF China Chairman, July 2018, **C-54**.
30   Email chain between BC Boo and VS Sekhon, 22 August 2018, **C-56**.

62.   In a letter dated 24 August 2018 to FF Top, Season Smart's counsel Baker McKenzie contended that the FF Principal Transfer Requirement had not been met because "[n]o satisfactory evidence has been produced which can prove that Mr Jia is not the controlling shareholder of the Founder TopCo taking into account the relevant Government Authorities and financial institution requirements."[31]

63.   The specific issues identified by Baker McKenzie in its 24 August 2018 letter were the following:

   a.   The financial standing and the source of funding of the transferee in acquiring the relevant Founder TopCo shareholding from Mr Jia had not been disclosed and were unclear, casting serious doubt on whether Mr Jia had fully and genuinely transferred his interests to the transferee and was no longer the ultimate controlling shareholder of Founder TopCo.

   b.   On 21 August 2018, a PRC governmental authority had issued a letter expressly indicating its concerns about Mr Jia and requesting further information to assess and verify whether Mr Jia remained as the ultimate controller of the Faraday entity in the PRC and was responsible for the Faraday China business and operations.

   c.   Despite Season Smart's efforts, the problems with the relevant financial institutions (including the attempt to lift the freeze on the foreign exchange accounts of Faraday China) had not been successfully resolved and the financial institutions still had many questions and enquiries regarding Mr Jia and Faraday.

64.   The letter referred to by Season Smart in (b) above was a letter from the Guangzhou Nansha Development Zone Investment and Trade Promotion Institute (**NGA**), a PRC governmental authority, addressed to Evergrande FF Intelligent Automotive (China) Group Co., Ltd.[32] Season Smart sent a copy of the NGA letter to Mr Jia on 22 August 2018. In the letter, the NGA asked for more information to allow it to evaluate whether Mr Jia was still ultimately controlling the management administration of Faraday and its subsidiaries in China. The NGA noted that Smart King still had a "dishonest person subject to enforcement (失信被执行人)" (Mr Jia) as its Global CEO, which it said had brought serious negative influences on Faraday's plans for develop of its operations in China, including the construction of manufacturing facilities in the Guangzhou Nansha Development Zone, and had also undermined the Government Authorities' willingness to support and promote that project. Therefore, the NGA encouraged Evergrande to ask its shareholders to consider some adjustment in the person holding the Global CEO position.

65.   In view of the above factors, Baker McKenzie opined that clearly the FF Principal Transfer Requirement had not been fulfilled and that Season Smart's funding obligation under Clause 2(a) of the A&C had not yet been triggered.

66.   Following Baker McKenzie's 24 August 2018 letter, the Parties exchanged a series of letters regarding Season Smart's obligations under the Transaction Agreements.[33] In its

---

[31]   Letter from Baker McKenzie to FF Top Holding Ltd. and Yueting Jia, 24 August 2018, **C-1**, p. 4.
[32]   Letter from NGA to Evergrande FF Intelligent Automotive (China) Group Co. Ltd., 21 August 2018, **C-57**.
[33]   Letter from Quinn Emanuel to Baker McKenzie, 27 August 2018, **C-59**; Letter from Quinn Emanuel to Baker McKenzie, 30 August 2018, **C-60**; Letter from Baker McKenzie to Quinn Emanuel, 30 August 2018, **C-58**; Letter from Quinn Emanuel to Baker McKenzie, 30 August 2018, **C-60**; Letter from Baker McKenzie to Quinn Emanuel, 31 August 2018, **C-63**; Letter from Quinn Emanuel to Baker McKenzie, 3

letter on behalf of Smart King dated 27 August 2018, Quinn Emanuel argued that the evidence it had previously submitted to Season Smart demonstrated that both the FF Principal Shareholder Requirement and FF Principal Director Requirement had been satisfied, and demanded immediate payment of US$300 million to Smart King pursuant to the A&C.[34]

67. In its reply letter of 30 August 2018, Baker McKenzie maintained its position as stated in its 24 August letter 2018 and refused to make the US$300 million Accelerated Payment due on 31 July 2018. Baker McKenzie also contended that the FF Principal Director Requirement had not been met because Season Smart was "not satisfied Mr Jia has genuinely resigned as director of the relevant companies and it is likely that he is in fact acting as a shadow director controlling or directing the decisions of directors closely associated with him".[35]

68. On 21 September 2018, the Board convened for a meeting. All seven Smart King directors were in attendance, including Mr Haijun Xia and Mr Jianjun Peng, the two directors appointed by Season Smart. The Board was notified that Smart King had received reasonable indications of interest from third parties regarding financing. The Board put to a vote authority for Smart King to seek all available alternative financing and conduct negotiations with third party financing sources as may be identified by a majority of the Board "if Evergrande does not promptly accept Smart King's reasonable proposal".[36] Mr Peng and Mr Xia voted against the motion. The motion was recorded in the minutes of the Board meeting as having been passed.[37]

## VI.   THE PARTIES' REQUESTS FOR RELIEF

69. In its Application,[38] Smart King requested the Emergency Arbitrator to grant the following relief in the form of an award:

   a.   An order that, until a Final Award is rendered by the Tribunal to be constituted pursuant to the Notice of Arbitration filed with this Request for Emergency Relief, or such earlier time as determined by the Tribunal, Season Smart is immediately enjoined from asserting any of its consent rights (or withholding approval) over Reserved Matters under the Shareholders Agreement, section 8 and Schedule II, alone or in combination, in respect of alternative capital financing in such form as the majority of Smart King's board of directors determines to be reasonable and necessary to meet Smart King's ongoing capital needs.

   b.   An order that Smart King pay the Claimant's costs of the emergency relief application, including the fees and expenses of the Emergency Arbitrator, the HKIAC administrative fees, and the reasonable legal and other costs incurred by the Parties, together with interest on costs.

   c.   Any other interim measure the Emergency Arbitrator deems appropriate.

---

September 2018, **C-61**. Letter from Faraday to Hui Ka Yan, 11 September 2018, **C-90**; Evergrande Letter to Faraday Senior Management, 13 September 2018, **C-91**.

[34]   Letter from Quinn Emanuel to Baker McKenzie, 27 August 2018, **C-59**; Letter from Quinn Emanuel to Baker McKenzie, 30 August 2018, **C-60**; Letter from Quinn Emanuel to Baker McKenzie, 3 September 2018, **C-61**.

[35]   Letter from Baker McKenzie to Quinn Emanuel, 30 August 2018, **C-58**, pp. 4-5.

[36]   Meeting Minutes of the Board of Directors of Smart King, 21 September 2018, **C-62**, at p.11.

[37]   *Ibid.*

[38]   Application, paragraph 170.

70. As a precondition for the granting of the abovementioned relief, Smart King gave the following undertakings with respect to securing alternative financing without Season Smart's consent:

    a. **Protection of Season Smart against dilution**:

        i. any dilution in shares as a result of obtaining new capital would be mutual across all classes of share ownership; or

        ii. Mr Jia shall (i) sell his shares and lend the proceeds to Smart King, and/or (ii) lend his shares to Smart King, which, along with the unused portion of the employee stock option pool, may be used for purposes of obtaining financing, in an amount sufficient to avoid dilution of Season Smart's interests in Smart King; if the arbitration concludes in Smart King's favour, Mr Jia and the unused portion of the employee stock option pool shall be entitled to recover their shares from the pool of shares that Season Smart would cede by virtue of the termination of the Transaction Agreements.

    b. **Protection of Season Smart against devaluation**:

        For purposes of obtaining new financing, Smart King would agree that the valuation of Smart King would be at or better than the pre-money valuation at which Season Smart invested in November 2017.

    c. **Fundraising cap**:

        The overall fundraising amount would be capped at US$700 million – the same amount to be funded by Season Smart on an accelerated basis pursuant to the A&C. [39]

71. Although Season Smart did not in its Response request specific relief from the Emergency Arbitrator, it did set out in detail its arguments as to why the Emergency Relief requested by Smart King should not be granted. Season Smart contended that there was no legal or factual basis to grant the Emergency Relief sought by Smart King, that the Application had been brought on scant merit and in circumstances where the balance of convenience clearly tilted against any grant of the requested Emergency Relief.

72. Mr Jia in his brief Second Respondent's Response did not respond specifically to all the matters raised in the Application, but said that he had read the Application and agreed with its contents. Mr Jia said that he supported the Application and agreed that the Emergency Arbitrator should grant the relief requested in paragraph 170 therein in the form of an award. Mr Jia also noted that Smart King had not sought any relief from Mr Jia in the Application. Nevertheless, Mr Jia said he would abide by any award issued by the Emergency Arbitrator, including but not limited to any measures that the Emergency Arbitrator considered necessary to protect Season Smart against dilution, such as those set out in paragraph 169 of the Application.

73. In response to directions given by the Emergency Arbitrator at the Hearing, Season Smart on 19 October 2018 submitted a revised draft order and undertakings (**Revised Request**). The Revised Request (which included three options for part of the draft order) is set out below:

---

[39]     *Ibid.*, paragraph 169.

a.  An order that, until a Final Award is rendered by the Tribunal to be constituted pursuant to the Notice of Arbitration filed with this Request for Emergency Relief, or such earlier time as determined by the Tribunal,

[*OPTION 1:* Season Smart is enjoined from exercising the consent rights contained in Section 8 and Schedule II of the SHA and as further reflected in the Smart King Articles of Association, Sections 33.1 and 49.2 and Schedule I (the *Purported Consent Rights*), in respect of any financing proposal (the *Proposal*) which meets the following conditions:]

[*OPTION 2:* the entering into of a proposal (the *Proposal*) which meets the conditions set out below will be deemed not to be a Reserved Matter for the purposes of Section 8 and Schedule II of the SHA and Sections 33.1 and 49.2 and Schedule I of the Smart King Articles of Association (the *Purported Consent Rights*), to the extent it otherwise would. The conditions are as follows:]

[*OPTION 3:* Season Smart approve in writing any financing proposal (the *Proposal*) which meets the following conditions:]

i.  The Proposal has been approved by a majority of Smart King's board of directors;

ii.  The total value of alternative debt or equity financing entered into by the Company which would, but for this Order, otherwise be subject to the Purported Consent Rights[40] (if those rights remain on foot, a matter on which this Order does not take a view) is capped at US$500 million;

iii.  If the Proposal involves issuing new equity securities:

A.  The Proposal will not have the effect of diluting Season Smart's shareholding disproportionately to other classes of shareholders;

B.  The Proposal will be based on a price-per-share that is no less than the price-per-share that Season Smart agreed to invest in at in November 2017 (the *Minimum PPS*). If the potential investor is unwilling to pay the Minimum PPS, then the Proposal may allow for any existing shareholder to sell its shares to the potential investor at such price as is necessary to ensure that the overall Proposal for the new equity raise is based on the Minimum PPS;

C.  The Proposal will include preemptive rights in favour of Season Smart, meaning specifically, that under the Proposal, Season Smart shall have the right to purchase shares at the same price of the newly issued equity as offered to the potential investor, up to such number of shares as would be necessary to maintain its stake in Smart King;

b.  An order that Season Smart pay the Claimant's costs of the emergency relief application, including the fees and expenses of the Emergency Arbitrator, the

---

[40]  The version in Option 3 is "purported consent rights" in lower case, with reference to Section 8 and Schedule II of the SHA and Sections 33.1 and 49.2 and Schedule I of the Smart King Articles of Association.

HKIAC administrative fees, and the reasonable legal and other costs incurred by the claim, together with interest on costs.

c.   Any other interim measure the Emergency Arbitrator deems appropriate.

## VII.   EMERGENCY ARBITRATOR'S ANALYSIS AND FINDINGS

74.   Article 23.1 of the HKIAC Rules provides that a party may apply for urgent interim or conservatory relief (Emergency Relief) prior to the constitution of the arbitral tribunal pursuant to the Emergency Arbitrator Procedures set out in Schedule 4 of the HKIAC Rules.

75.   As pointed out by Smart King in the Application, Article 23.2 of the HKIAC Rules provides that, at the request of either Party, any interim measure may be ordered by the Emergency Arbitrator that he deems to be necessary or appropriate.

76.   Smart King also refers in the Application to the provisions of Article 23.4 of the HKIAC Rules, which apply to all interim measures ordered under the HKIAC Rules, including under the Emergency Arbitrator Procedures, and which set out the following two factors that need to be considered (without limitation) in determining whether an interim measure sought should be granted:

　　a.   harm not adequately reparable by an award of damages is likely to result if the measure is not ordered, and such harm substantially outweighs the harm that is likely to result to the party against whom the measure is directed if the measure is granted; and

　　b.   there is a reasonable possibility that the requesting party will succeed on the merits of the claim.

77.   The Emergency Arbitrator notes that the factors set out in Article 23.4 are described as being without limitation, and other relevant factors may need to be considered.   In particular, Articles 2(d) and (e) of the Emergency Arbitrator Procedures require an application for Emergency Relief to include the following information:

　　d.   the reasons why the applicant needs the Emergency Relief on an urgent basis that cannot await the constitution of an arbitral tribunal; and

　　e.   the reasons why the applicant is entitled to such Emergency Relief.

78.   The Emergency Arbitrator also notes the provisions of Article 23.3 of the HKIAC Rules, which emphasises the temporary nature of any interim relief that the Emergency Arbitrator might order, and sets out a non-exhaustive list of the interim relief that might be ordered. The list includes any order by the Tribunal prior to the issuance of the award by which the dispute is finally decided, that a party:

　　a.   maintain or restore the status quo pending determination of the dispute;

　　b.   take action that would prevent, or refrain from taking action that is likely to cause, current or imminent harm or prejudice to the arbitral process itself;

　　c.   provide a means of preserving assets out of which a subsequent award may be satisfied; or

d.    preserve evidence that may be relevant and material to the resolution of the dispute.

79.    The Emergency Arbitrator considers that Article 23.2 of the HKIAC Rules, taken together with the other provisions referred to above, gives him broad but not completely unfettered discretion to award interim Emergency Relief that he deems sufficiently urgent, necessary and appropriate in the circumstances of the case. As for burden of proof, it is the applicant Smart King's burden to establish at least a prima facie compelling case that the requested measures are justified and required. This means that Smart King also bears the burden to prove, at least to a prima facie standard, the facts upon which the Applications relies.

80.    In summary, the following factors are generally accepted to be prerequisites for granting interim relief, and will apply to the Emergency Arbitrator's consideration of whether to grant the requested Emergency Relief in the present case: (1) jurisdiction; (2) reasonable possibility of success on the merits; (3) urgency and the need to avoid irreparable harm; and (4) proportionality or balance of harm. Those factors will be considered in turn below, after which the Emergency Arbitrator will also consider whether any other factors need to specifically considered in the present case.

## (1)    Jurisdiction

81.    As noted above, pursuant to Article 5 of the Emergency Arbitrator Procedures the HKIAC made a threshold decision on 4 October 2018 to accept the Application and appointed the Emergency Arbitrator on 5 October 2018.

82.    In addition, Article 2(f) of the Emergency Arbitrator Procedures requires the applicant for Emergency Relief to submit information on any relevant agreement(s) and, in particular, the arbitration agreement(s). In its Application, Smart King referred to the SHA and in particular Section 16.6 of the SHA. Section 16.6(f) of the SHA provides that any party to a dispute under that agreement would be being entitled to seek interim or conservatory relief from an emergency arbitrator prior to the constitution of the Tribunal. As noted above, Section 12 of the A&C states that the provisions of Section 16.6 of the SHA shall apply mutatis mutandis to the A&C.

83.    The combined effect of these various provisions is that the Emergency Arbitrator has clear jurisdiction over Smart King's Application.

## (2)    Reasonable Possibility of Success on the Merits

84.    As noted above, Article 23.4(b) of the HKIAC Rules provides that, in granting interim relief, a tribunal, for example the Emergency Arbitrator in this Application, must be satisfied that "there is a reasonable possibility that the requesting party will succeed on the merits of the claim".

85.    That enquiry involves two steps. First, the Emergency Arbitrator must determine the proper test for assessing whether the requirements of Article 23.4(b) have been met. Having determined that test, the next step is to apply the test to the question of whether Smart King has a reasonable possibility of persuading the Tribunal to be appointed to consider the merits of Smart King's claims that Season Smart has breached the Transaction Agreements in the ways alleged by the Claimant, and that Smart King should be awarded the specific relief requested by Smart King in the NOA.

*The test for "reasonable possibility of success on the merits"*

86. The Parties appear to be in agreement that the starting point is the natural and ordinary meaning of the words of Article 23.4(b), in other words the applicant must show a prima facie case that it has a reasonable chance to succeed on the merits, or that there is at least a serious issue to be tried.

87. Nevertheless, Season Smart said that in the particular circumstances of the present Application, where the nature of the relief sought by Smart King amounted to a mandatory rather than prohibitory injunction, and where the relief if granted was unlikely to be easily reversible or might lead to "irremediable prejudice" to Season Smart, the applicant needed to show a "high degree of assurance" that it would succeed on the merits before the Tribunal, as indicated by the Privy Council in the case of *National Commercial Bank Jamaica v Olint* (*Olint*).[41]

88. Having read the authorities referred to by Season Smart in this regard and the amended relief now sought by Smart King, the Emergency Arbitrator considers that the "reasonable possibility of success" standard should not be lightly departed from unless the relief sought from the Emergency Arbitrator is likely to be permanent or to dispose of a substantive claim, which he is not persuaded is the case in the present Application, for the reasons that will be discussed in more detail below in this Award.

89. The Emergency Arbitrator will therefore apply the Article 23.4(b) standard of "reasonable possibility of success on the merits" in accordance with its natural and ordinary meaning. In addition, given the truncated nature of the Emergency Relief proceedings, and the limited scope of the Emergency Arbitrator's mandate, it is worth noting that his enquiry into the merits of the Parties' claims and defences is by necessity and obligation on a prima facie basis only, without any detailed or definitive assessment of the evidence or the merits of the Parties' legal arguments. Furthermore, as noted in the second sentence of Article 23.4(b) of the HKIAC Rules, "[t]he determination on this possibility shall not affect the discretion of the arbitral tribunal in making any subsequent determination."

*Applying the test to Smart King's substantive claims*

90. In its NOA, Smart King requested the Tribunal to (i) declare that Season Smart has renounced the Transaction Agreements; (ii) declare that Smart King was entitled to terminate, and did terminate effective from 3 October 2018, the Transaction Agreements; (iii) order that Season Smart comply with all reasonable requests made by Smart King for the purposes of effecting the amendment and restatement of the Articles of Association of Smart King (**Smart King Articles**) to revert to the version extant immediately prior to the execution of the SHA, including by exercising its voting rights in passing the required special resolutions and by providing the necessary written approvals; (iv) order that Season Smart pay damages for Smart King's losses suffered as a result of Season Smart's renunciation of the Transaction Agreements; and (v) order that Smart King pay interest and costs.

91. The basis of Smart King's claims in the NOA was that Smart King had, in the A&C, preserved and expanded Season Smart's control rights under the SHA on the premise that Season Smart would make the Accelerated Payments according to the schedule agreed in Section 2 of the A&C. Season Smart had wrongfully breached that obligation, which went to the heart of the Parties' investments and the benefit of the bargain

---

[41] [2009] 1 WLR 1405 at §19, **CL-8**.

contemplated by the Parties in the Transaction Agreements. Season Smart's refusal to perform was therefore a renunciation of the Transaction Agreements. Further, Smart King argued, Season Smart was using its control rights under the SHA to block Smart King's only alternative chance of survival (third party debt or equity financing), in a deliberate attempt to starve Smart King of cash and to force Smart King to renegotiate the entire bargain. In order to save the company from bankruptcy, Smart King's only option was to exercise its common law right to terminate the Transaction Agreements and seek the various items of relief set out in the preceding paragraph.

92.  As set out in detail in the NOA, the Tribunal would need, in order to grant any of the relief referred to in the paragraphs above, to first make two related initial findings. First, that the FF Principal Transfer Requirement and the FF Principal Director Requirement, as referred to in Section 3 and Section 4 respectively of the A&C, had been satisfied. Secondly, that as a consequence the A&C had taken effect. The first step for the Emergency Arbitrator in his assessment of whether Smart King had a reasonable chance of succeeding on the merits issue was therefore to make a preliminary assessment of whether the FF Principal Transfer Requirement and the FF Principal Director Requirement had been met. As Smart King said at the Hearing, the Parties were in agreement on "what the crux of the case is", which was the proper interpretation of Sections 3 and 4 of the A&C. [42] The Parties agreed, and the Emergency Arbitrator concurs, that the relevant principles governing interpretation of those sections are those set out by Lord Hoffmann in the case of *Investors Compensation Scheme* v *West Bromwich Building Society (No.1)*. [43] In other words, the test is what a reasonable person looking at a party's contract would understand it to mean, having regard to the relevant factual matrix.

93.  Applying that test, if the Emergency Arbitrator thought that there was a reasonable chance that Smart King would succeed on the interpretation point, he would then need to make a further preliminary assessment of the following issues: whether the Transaction Agreements had been renounced, Smart King's right to terminate, and Smart King's entitlement to the various items of relief that it was seeking. This was not for the purposes of making any definitive findings on those issues, but merely in order to determine whether Smart King had passed the threshold of showing a reasonable chance of succeeding on the merits before the Tribunal.

94.  The underlying purpose of this assessment exercise was to assist the Emergency Arbitrator when it came to the balance of convenience or harm stage (to be discussed below), and in particular to assist the Emergency Arbitrator in weighing up the risk that any order he may make could turn out to have been wrongly granted and any likely consequences of such an outcome.

95.  Smart King expressed confidence that it was highly likely to succeed in all aspects of its claim before the Tribunal. With respect to satisfaction of the FF Principal Transfer Requirement, Smart King argued that each element of that requirement had been satisfied. First, Mr Jia had transferred his shares in Founder TopCo (the entity holding his interests in Smart King) to Lian Bossert, who Smart King submitted had been specifically endorsed by Season Smart as an Accepted Third Party. Second, Mr Jia had provided evidence of the transfer and that he was therefore not the ultimate controlling shareholder (实际控制人) of Founder TopCo in a form that had been negotiated with, and was satisfactory to, Season Smart. Third, Ms Bossert executed a

---

[42]  T82/24-25.
[43]  [1998] 1 WLR 896.

deed of adherence on 28 July 2018, which was provided to and accepted by Season Smart.

96. The detailed list of all the documentation provided by Smart King and its counsel to Season Smart to evidence the satisfaction of the FF Principal Transfer Requirement was set out in Quinn Emanuel's letter to Baker & McKenzie dated 27 August 2018.[44] In particular, the letter referred to a Certificate of Voting Power Transfer dated 1 August 2018,[45] which it said was prepared and requested by Season Smart, and which showed that Mr Jia was not the ultimate controlling shareholder (实际控制人) of Founder TopCo. In the letter, Quinn Emanuel opined that Baker & McKenzie and/or Season Smart itself had reviewed all this documentation and confirmed that they were sufficient to satisfy the FF Principal Transfer Requirement. An example of evidence of this confirmation was the email exchange between Jerry Wang of Faraday and Feifei Bian of Sidley Austin on the one hand, and Sze Shing Tan of Baker McKenzie on the other, on 25 and 26 July 2018. In that exchange, having provided the passport and address details of Lian Bossert, Jerry Wang asked whether any more information was needed, and Sze Shing Tan responded that "[t]hat is fine for the purposes of the documents".[46]

97. As for the FF Principal Director Requirement, Smart King contended that it had provided evidence satisfactory to Season Smart that Mr Jia had duly resigned from his directorships and position as vice chairman of the Board, with a certificate, the language of which had been provided by Season Smart, issued to evidence this. The details of the documentation and information provided by Smart King to Season Smart were also set out in Quinn Emanuel's 27 August 2018 letter to Baker & McKenzie.[47]

98. Accordingly, Smart King argued that Season Smart had indicated by its words and conduct that the FF Principal Transfer Requirement and the FF Principal Director Requirement had both been satisfied, and Season Smart should be estopped from now contending otherwise. First, at no stage during the course of negotiating the documentation required under Sections 3 and 4 did Season Smart or its lawyers indicate that anything more than the documentation set out in those sections would be required. Second, Season Smart's request that Mr Jianjun Peng be appointed as the FF China Chairman and the FF China Legal Representative could only have been made if all Parties understood that the A&C had already taken effect.

99. With respect to Season Smart's later insistence that it was not "satisfied" that the FF Principal Transfer Requirement and the FF Principal Director Requirement had been met, Smart King argued that Season Smart's discretion to decide whether those requirements had been met was not absolute, and needed to be exercised in good faith and not arbitrarily or capriciously. In any case, argued Smart King, Season Smart had already exercised its discretion and confirmed that it was satisfied with the documentation, and could not then go back on that confirmation, as it had attempted to do in the letter from Baker McKenzie dated 24 August 2018.

100. Smart King also submitted that the specific arguments raised in Baker McKenzie's letter to show that the FF Principal Transfer Requirement had not been satisfied were groundless. First, Season Smart had raised the concern that the financial standing and source of funding of Lian Bossert in acquiring the Founder TopCo shares from Mr Jia had not been disclosed and was unclear, and that this cast doubt on whether Mr Jia

---

[44]     **C-59**, p.2.
[45]     **C-48**.
[46]     Email chain at **C-39**, p.15.
[47]     **C-59**, pp.2-3.

had fully and genuinely transferred his interests away and was no longer the ultimate controlling shareholder (实际控制人) of Founder TopCo. However, argued Smart King, all that was required under the Transaction Agreements was a mechanical transfer by Mr Jia of the legal interest in his shares to a third party acceptable to Season Smart,[48] and Mr Jia had complied with that requirement. Season Smart did not have the additional right under the Transaction Agreements to assess the sufficiency of the consideration paid for the shares or the "genuineness" of the transfer, a right which Smart King submitted would be wholly subjective and unworkable.

101. In this regard, Smart King also argued that the commercial context ran in Smart King's favour. Mr Jia's stake in Smart King was worth approximately US$1.48 billion, and no reasonable commercial party would expect a transfer of that magnitude to be arranged in 30 days, let alone the two weeks it in fact took for Ms Bossert to come in to the company.[49]

102. This argument was also supported by the evidence of Jerry Wang, Vice President of Global Capital Markets for Faraday, who testified that Evergrande's representatives (James Xia, Jimmy Wong and Jianjun Peng) had explained to him orally that the FF Principal Transfer Requirement would be met by finding a non-Chinese nominee to hold Mr Jia's shares, and that it would be acceptable for Mr Jia to keep the economic interest relating to those shares. Indeed, said Mr Wang, disposing of Mr Jia's shares for value would have been impossible at the time given Faraday's financial condition.[50]

103. Second, with respect to the letter from the NGA, Smart King said this was simply irrelevant. The NGA letter was only issued on 21 August 2018, three weeks after Season Smart was required to make the first Accelerated Payment, and after the A&C had already taken effect. In any event, the A&C was specifically negotiated in the context of the Parties' knowledge of Mr Jia's status as a declared debtor. The fact that it was raised again in the NGA letter could not be used retrospectively to build into the A&C requirements that were not there.

104. Third, with respect to Season Smart's complaints that certain foreign exchange accounts of Faraday China had been frozen, Smart King argued that this was irrelevant since there is nothing in the Transaction Agreements that predicated Season Smart's obligation to make the Accelerated Payments on the status of those accounts.

105. As for the FF Principal Director Requirement, Smart King pointed out that Season Smart only purported to be dissatisfied "in substance" with that requirement in Baker McKenzie's letter of 31 August 2018, which indicated that Season Smart's position was merely a bad faith afterthought. Smart King also rejected Season Smart's argument that Mr Jia's close relationships with current directors of Faraday somehow indicated that Mr Jia was a "shadow director". Smart King said this accusation was based on pure speculation, and in any case Section 4(b) merely required that Mr Jia resign as director of each of the relevant companies and as vice chairman of the Board, which Mr Jia had done. Furthermore, the A&C did not oblige Mr Jia to give up any and all management roles in all of the group companies. On the contrary, Section 4(b) was specifically limited to Mr Jia's directorships, and Mr Jia's other rights, including his right to remain as CEO of Smart King, were specifically reserved under Section 3(c)(i) of the A&C.

---

48      A&C, **C-2**.
49      Reply, paragraph 16.
50      Wang WS, [17].

106. Smart King therefore concluded that Season Smart had no grounds for alleging that the FF Principal Transfer Requirement and the FF Principal Director Requirement had not been met. The reasons provided by Season Smart were merely *post facto* excuses to justify its withholding of promised payments to Smart King at a critical time, as part of a blatant attempt to engineer defaults and to gain control of Faraday China's operations and intellectual property.

107. Apart from the positions expressed by Season Smart with respect to the FF Principal Transfer Requirement and the FF Principal Director Requirement in the relevant correspondence between the Parties, which have been referred to in the summary of Smart King's arguments set out above, Season Smart in its Response set out some additional arguments, which are summarised in the following paragraphs.

108. Season Smart's case as set out in the Response was that, having regard to the express words used by the Parties in the A&C, the undisputed factual matrix (including notably the negative effect that Mr Jia's continued presence and high level of control was having on Faraday China's operations, in particular with respect to dealings with the relevant PRC Governmental Authorities and financial institutions), and the applicable principles on construction, Sections 3(b) and 4(b) of the A&C plainly require Mr Jia to divest himself of all legal and beneficial interest in FF Top (and through it Smart King) as well as directorships that would enable him to remain as the ultimate controlling shareholder (实际控制人) exercising actual control over Smart King. Smart King did not deny that Mr Jia still held the beneficial interest following the transfer, and the FF Principal Transfer Requirement had therefore, in Smart Season's submission, not been fulfilled.

109. Season Smart submitted that the meaning of transfer in Section 3(b)(i) was necessarily informed by Section 3(b)(ii)(B), which obliged Smart King to provide evidence satisfactory to Season Smart that Mr Jia was "not the ultimate controlling shareholder (实际控制人) of the Founder TopCo following such transfer in such form that is satisfactory to [Season Smart] (taking into account relevant Governmental Authorities and financial institutions requirements) ... ". Season Smart argued that the references to the ultimate controlling shareholder (实际控制人) and the requirements of the relevant Governmental Authorities and financial institutions were crucial and had been completely ignored by Smart King, meaning Smart King was not even able to establish a triable issue.

110. Specifically, Season Smart argued that "ultimate controlling shareholder (实际控制人)" referred to and included beneficial ownership, having regard to the way that term had been used in other documents executed by the Parties, for example clause 7 of the Term Sheet (executed only in Chinese),[51] wherein a distinction was drawn between 股东 (shareholder) and 实际控制人 (ultimate controlling shareholder). In other words, the transfer must not just be the legal title, but everything that constitutes Mr Jia as an ultimate controlling shareholder (实际控制人), including beneficial ownership of the shares.

111. With regard to the phrase "taking into account relevant Governmental Authorities and financial institutions requirements", Season Smart contended that this was referable to the transfer of Mr Jia's shares and to Mr Jia's not being an ultimate controlling shareholder (实际控制人) after the transfer. Season Smart said this was clear from the context leading up to the A&C, and notably the obstacles to Smart King's PRC

---

51     **C-74**.

25

operations arising from their ownership by and close association with Mr Jia, who was regarded with some disapproval by the PRC government and financial institutions, as indicated by his status as a "dishonest person subject to enforcement (失信被执行人)". In considering whether the relevant evidence was satisfactory, Season Smart was therefore entitled to take into account the requirements and opinions of the relevant Government Authorities and financial institutions. As the NGA letter indicated, and as Season Smart had stated in the correspondence between the Parties, there was a doubt in the minds of the Governmental Authorities (and by extension of Season Smart) as to whether the transfer effected by Mr Jia was real, and whether after the transfer Mr Jia had remained as the ultimate controlling shareholder (实际控制人) of Smart King.

112. As for the FF Principal Director Requirement, Season Smart submitted that, given the purpose of Section 3(b) was to remove beneficial ownership from Mr Jia such that he ceased to be an ultimate controlling shareholder (实际控制人), such purpose should also inform the construction of Section 4(b). Again, Season Smart argued for substance over form: if all that was required under Section 4(b) was for Mr Jia to cease his *de jure* directorships, that would not remove his ability to exercise actual control, because there exist in law other forms of directorship that would allow someone who is not a *de jure* director to exercise actual control over the affairs of a company, for example "shadow" or *de facto* directorship. To satisfy the FF Principal Director Requirement, therefore, Smart King was obliged to provide satisfactory evidence that Mr Jia had resigned as and ceased to be a director (in all forms recognised by law, including *de facto* directorship) of each of the "Founder Entities", Smart King and all companies within the Smart King group, and Smart King had failed to do so.

113. Season Smart also argued that it was irrelevant that following the transfer and resignation from the directorships Mr Jia would continue to act as CEO of Smart King and retain his rights as "Founder" under the SHA and the Merger Agreement. Being the CEO (an employee of Smart King who could be removed) and having certain rights as Founder (which were all tied to Mr Jia's carrying out his duties as CEO) did not mean that he was entitled to remain in some way as the ultimate controlling shareholder (实际控制人). Season Smart also denied the allegation by Smart King witness Jerry Wang that, before and at the time of execution of the A&C, Season Smart had assured Smart King that Sections 3(b) and 4(b) could be satisfied by transfer to a nominee and that Mr Jia could keep his economic interests relating to those shares.[52]

114. Season Smart also argued that Smart King's estoppel arguments must fail, because on the evidence Season Smart never confirmed to Smart King that Sections 3(b) and 4(b) had been satisfied, despite being asked to so confirm by Smart King.[53] Furthermore, the appointment of Mr Peng as the FF China Chairman and FF China Legal Representative did not mean that the A&C had already taken effect. Rather, the appointments were made pursuant to the Parties' agreement to clothe Mr Peng with the necessary authority as soon as practicable so that he could liaise with the relevant Governmental Authorities and financial institutions for the purposes of resolving Smart King's ongoing problems in China. The appointments were therefore not an indication that the requirements of Sections 3(b) and 4(b) of the A&C had been complied with.[54]

115. Smart King in its submissions went to some length to speculate on the motivations of Season Smart in not recognising the fulfilment of the FF Principal Transfer Requirement and the FF Principal Director Requirement. In particular, Smart King

---

[52] Wang WS, [17].
[53] Rsponse, paragraph 84.
[54] *Ibid.*

alleged that Season Smart's claim that it was not "satisfied" that the FF Principal Transfer Requirement and the FF Principal Director Requirement had been met was simply a tactic in furtherance of its "cash-starve" strategy.

116. At this stage, based on the evidence before him, the Emergency Arbitrator is not in a position to assess the credibility of Smart King's allegations in this regard, and the Emergency Arbitrator will not speculate himself on the motivations attributed by Smart King to Season Smart's actions. Instead, the Emergency Arbitrator will focus simply on whether Smart King has a reasonable chance of persuading the Tribunal that the FF Principal Transfer Requirement and the FF Principal Director Requirement had been fulfilled, meaning the A&C would have come into effect.

117. With respect to the FF Principal Transfer Requirement, the first question is whether the terms of Section 3 of the A&C require merely a mechanical transfer of the legal interest in Mr Jia's shares in Founder TopCo to the Accepted Third Party, or something more. In this regard, the Emergency Arbitrator agrees with Season Smart that Section 3(b)(i) of the A&C needs to be read together with Section 3(b)(ii)(B). In other words, Mr Jia is obliged, within 30 days after the date of signing of the A&C, to provide evidence not only of the transfer itself but also that Mr Jia is not the ultimate controlling shareholder (实际控制人) of Founder TopCo following such transfer, in such form that is satisfactory to Season Smart (taking into account the requirements of relevant Governmental Authorities and financial institutions).

118. The Emergency Arbitrator considers that the references to "ultimate controlling shareholder (实际控制人)" and "taking into account relevant Governmental Authorities and financial institutions requirements" must mean something and that the Tribunal might not be easily convinced by Smart King's submission that Mr Jia's divesting himself of only the legal but not the beneficial interest in the shares of Smart King was sufficient to mean that Mr Jia was no longer the "ultimate controlling shareholder (实际控制人)". At the same time, the Emergency Arbitrator is also not persuaded that Season Smart's interpretation of "ultimate controlling shareholder (实际控制人)", implying a full transfer of all of Mr Jia's legal and beneficial interests in the shares, in the context of the relevant factual matrix, is certain to be accepted by the Tribunal.

119. Indeed, the meaning of "ultimate controlling shareholder (实际控制人)" is likely to be subject to extensive submission before the Tribunal, particularly as the literal meaning of the phrase in Chinese ("actual controlling person" or "actual person in control") possibly carries slightly different connotations from the English "ultimate controlling shareholder". At the very least, it is not altogether clear to the Emergency Arbitrator in the context that the reference to not being an "ultimate controlling shareholder (实际控制人)" must automatically mean that Mr Jia was obliged under Section 3(b) to divest himself of both the legal and the beneficial ownership (however that may be defined, which will be another important area of submission before the Tribunal) of the shares, which is a key part of Season Smart's argument for saying that the FF Principal Transfer Requirement had not been fulfilled.

120. Taking into account the entire factual matrix, including the documents actually requested and reviewed by Season Smart with respect to the transfer of Mr Jia's shares to Ms Bossert (which Season Smart's counsel indicated were sufficient, at least "for the purposes of the documents"[55]), it seems to the Emergency Arbitrator at least reasonably possible that Smart King could succeed in its argument that both Parties

---

[55]     **C-39**, p.15.

understood that the requirement that Mr Jia no longer be the "ultimate controlling shareholder (实际控制人)" might be satisfied by transfer to a nominee such as Lian Bossert, with Mr Jia retaining certain beneficial interests in the shares, such as the economic interests flowing from the shares and/or certain voting rights attached to those shares. The same factual matrix appears to the Emergency Arbitrator to provide at least a reasonable possibility for Smart King to succeed on one or more of its estoppel arguments (whether it be estoppel by representation or estoppel by convention), particularly if the Tribunal were persuaded that Season Smart had led Smart King to believe that Season Smart had provided all the documentation and other evidence that was necessary in this regard, and it was only afterwards that Smart Season started to raise new requirements that were not previously discussed or justified by the wording of Section 3(b).

121. The phrase "taking into account relevant Governmental Authorities and financial institutions requirements" is also subject to various possible interpretations. At the very least, it must mean that, in assessing whether Mr Jia is not the ultimate controlling shareholder (实际控制人) of Founder TopCo following the transfer, Season Smart can take into account, at least to some degree, the requirements of the Governmental Authorities and financial institutions. Season Smart says this relates to the fact that Mr Jia had been labelled a "dishonest person subject to enforcement" (失信被执行人)". This meant that the relevant PRC governmental authorities and banks, particular in Guangdong Province where Season Smart intended to further develop its Chinese operations, would be understandably wary of providing support if they considered that Mr Jia had too much control of Smart King and Smart King's relevant PRC subsidiaries. This seems a reasonably likely explanation of the background to Section 3(b), but even if it were accurate (and again that would need to be argued fully at the merits stage), it would not resolve the question of what "taking into account" actually means in this context.

122. One key question will be how wide a margin should Season Smart be given in deciding whether it was satisfied with the evidence provided by Smart King to show it had fulfilled its requirements under Section 3(b). Season Smart has conceded that its discretionary powers must not be exercised in an unreasonable or capricious way and also that the relevant Governmental Authorities or financial institutions did not have a decisive or final say as to whether Smart King had satisfied its obligations under Section 3(b) of the A&C.[56] Nevertheless, if the Tribunal found that Season Smart was for whatever reason relying too heavily on the word or opinion of Governmental Authorities (or of just one of them, the NGA), it is at least reasonably possible that the Tribunal could decide that Season Smart had not exercised its discretion to decide whether it was satisfied with the evidence provided by Smart King in a reasonable manner and that, moreover, Smart King had objectively complied with its obligations under Section 3(b).

123. In summary, the Emergency Arbitrator can see some merit in both Smart King's and Season Smart's arguments with respect to the proper interpretation in context of the phrases "ultimate controlling shareholder (实际控制人)" and "taking into account relevant Governmental Authorities and financial institutions requirements". As indicated earlier in this Award, the Emergency Arbitrator does not have to (and should not) come to any conclusion as to which Party might have the stronger case in this regard. In other words, the Emergency Arbitrator is not to make any prejudgment on the merits of the Parties' claims and defences. For the purposes of this Application, and having assessed the entirety of the Parties' submissions with respect to Section 3(b), it will be

---

56      T150/11-13; T150/25 – T151/1.

sufficient if the Emergency Arbitrator is satisfied, and he is so satisfied, that Smart King has made out a serious case to answer in respect of the satisfaction of the FF Principal Transfer Requirement, and has at least a reasonable possibility of persuading the Tribunal that Smart King's obligations under Section 3(b) had been fulfilled.

124. With respect to the FF Principal Director Requirement, the first question is what evidence (satisfactory to Season Smart) Mr Jia needed to show that "he is not the director of any Founder Entity or Group Company and is not the vice chairman of the Board promptly after effecting the relevant resignations under this Section 4(b)". Smart King argued that Section 4(b) merely required Mr Jia to show that he had duly resigned from his directorships and position as vice chairman of the Board, which he had done by issuing the Certificate of Voting Power Transfer dated 1 August 2018,[57] the language of which had been provided by Season Smart.

125. One of the main differences between Sections 3(b) and 4(b) of the A&C is that the latter provision does not refer to the purpose of Mr Jia's resignations. The Emergency Arbitrator is somewhat sceptical of the strength of Season Smart's argument that the purpose set out in Section 3(b) should apply to Section 4(b). In addition, it will probably not be sufficient for Season Smart to merely raise the possibility that Mr Jia remained as a shadow director after his resignations to call into question whether the FF Principal Director Requirement had been fulfilled. Given the wording of Section 4(b), in the Emergency Arbitrator's opinion the burden will be on Season Smart to demonstrate to the Tribunal that Mr Jia had indeed remained as a shadow director and, if he had done so, to show why that would be in breach of Section 4(b). In the Emergency Arbitrator's opinion, that will not necessarily be an easy burden to discharge.

126. Accordingly, the Emergency Arbitrator is persuaded that Smart King would have a reasonable possibility at the merits stage of this arbitration of establishing to the Tribunal that both the FF Principal Transfer Requirement and the FF Principal Director Requirement had been satisfied, and that the A&C had therefore come into effect. In coming to that conclusion, the Emergency Arbitrator concedes that Season Smart also has some valid counterarguments on the question of whether the two requirements had been satisfied. Again, it is not the Emergency Arbitrator's task to make a determination as to which Party has the stronger case in that regard, which is a matter to be dealt with later by the Tribunal.

127. The next question to be addressed is whether, assuming the Tribunal might be persuaded that the FF Principal Transfer Requirement and the FF Principal Director Requirement had been met, did that mean that Smart King was also likely to obtain declarations from the Tribunal that Season Smart had renounced the Transaction Agreements and that therefore Smart King was entitled to terminate, and did terminate effective from 3 October 2018, the Transaction Agreements?

128. As set out by Smart King in its Application,[58] the test for renunciation of a contract under Hong Kong law essentially involves a party evincing, by words or conduct, an intention not to perform, or expressly declares that he is or will be unable to perform his obligations under the contract in some essential respect. Short of an express refusal or declaration, the test is to ascertain whether the action or actions of the party in default are such as to lead a reasonable person to conclude that it no longer intends to be

---

57    **C-48**.
58    Application, paragraphs 104-107.

bound by its provisions. This test is an objective one which is independent of the subjective intentions of the party said to be renouncing the contract.[59]

129. The party in default may intend in fact to fulfil the contract but may be determined to do so only in a manner substantially inconsistent with his obligations. Or, it may refuse to perform the contract unless the other party complies with certain conditions not required by its terms. In such cases, Hong Kong law would also deem the contract renounced.[60] Once a party is shown to have renounced the contract, the innocent party may accept the renunciation, treat it as discharging him from further performance, and sue for damages.[61]

130. By refusing to comply with the terms of the A&C, and in particular in failing to make the payment of US$300 million due on 31 July 2018, Smart King submitted that Season Smart had renounced the entire suite of Transaction Agreements between the Parties. Smart King was therefore entitled to accept that renunciation and to terminate the Transaction Agreements, which termination was notified on 3 October 2018, as confirmed in the Notice of Arbitration.

131. Season Smart submitted that even if there had been any breach of the A&C by Season Smart (which it denied), the A&C was only one of many agreements entered into between the Parties and the alleged breach of the A&C would not amount to, or be sufficient for, a repudiation of the entire bargain of the merger leading to the current corporate structure and Season Smart's investment into it.

132. The Emergency Arbitrator is persuaded that, if the Tribunal found that the FF Principal Transfer Requirement and the FF Principal Director Requirement had been satisfied, that should necessarily mean a finding that the A&C had come into effect and that its terms, including the Accelerated Payment schedule set out in Section 2(a)(i) of the A&C, had become binding on the Parties. A failure to make any of those payments when due would therefore be very likely to be held to be a renunciation, or repudiatory breach, of the A&C entitling Smart King to either affirm the contract and press the party in breach (in that scenario Season Smart) to perform or to terminate those agreements, meaning the innocent party (in the same scenario Smart King) would be entitled to treat itself as discharged from future performance. There is no specific provision for termination for breach in the A&C, and so Smart King would be relying on its right to terminate under common law.

133. The only caveat to that conclusion is with respect to the issue of whether a breach of the A&C would entitle Smart King to terminate all the Transaction Agreements, as Smart King contended. There was not enough information before the Emergency Arbitrator to allow him to come to even a preliminary assessment on that issue. There are also other issues that were referred to by the Parties in relation to the Application, but not in such detail as to allow the Emergency Arbitrator to factor them in to his assessment of whether Smart King had a reasonable possibility of succeeding on the merits. Examples included the scope of applicability of the exceptions to the requirement for consent set out in paragraph (c) of Schedule II of the SHA, and the significance of the liquidated damages provision in 5.12(d) of the Merger Agreement. Those are issues that will no doubt be aired in more detail at the merits stage.

---

[59] Leung Yuk Lin t/a King's Glory Educational Centre and ors v Karson Oten Fan, Karno [2009] HKCFI 566, **CL-13**, at [256]-[260], citing Chitty on Contracts, 13th Edition, Vol 1; Tinchant S A v Tak Wo Metal Industries and anor [2003] HKCFI 865, **CL-14**, at [33], citing Chitty on Contracts, 28th Edition.

[60] Ibid.

[61] Tinchant S A v Tak Wo Metal Industries and anor [2003] HKCFI 865, **CL-14**, at [33], citing Chitty on Contracts, 28th Edition.

134. The next question to address is whether Smart King would have a reasonable chance of obtaining the other relief it seeks in the Notice of Arbitration on the assumption that its termination of the A&C and related Transaction Agreements was found to be valid. As noted above, as well as damages in an amount to be determined, Smart King also seeks an order that Season Smart comply with all reasonable requests made by Smart King for the purposes of effecting the amendment and restatement of the Smart King Articles to revert to the version extant immediately prior to the execution of the SHA, including by exercising its voting rights in passing the required special resolutions and by providing the necessary written approvals.

135. Season Smart did not dispute Smart King's right to claim damages in the event of a valid termination, although it reserved its rights on whether Smart King would be entitled to terminate any or all of the Transaction Agreements in case of a breach by Season Smart of any of those agreements. Season Smart also argued that Smart King had no prospect of obtaining any relief with respect to an amendment and restatement of the Smart King Articles, because it was, it said, misconceived as a matter of law. First, Season Smart argued that termination of an agreement only operates prospectively and does not nullify a contract, unlike rescission, which refers to the retrospective avoidance (*ab initio*) of a voidable contract. Therefore, submitted Season Smart, there was no basis for Smart King to seek to reverse the Smart King Articles to the pre-contractual position.

136. Moreover, rescission was only available on limited grounds such as fraud, duress and misrepresentation and can only be effected *in integrum*, meaning that Smart King must first return everything it received from Season Smart pursuant to the Transaction Agreements, including the US$800 million paid to Smart King by way of Subscription Payments. Season Smart noted that Smart King has not made, has not offered to make, and given its supposed insolvency is plainly incapable of making, counter-restitution as required. Accordingly, argued Season Smart, rescission would not be open to Smart King in any event.

137. In response, Smart King denied that what it was seeking in the main arbitration amounted to rescission. Rather, its prayer for relief in relation to the amendment of the Smart King Articles was a form of relief that would only operate as a discharge of future performance in relation to the consent rights.[62]

138. With respect to damages, the Emergency Arbitrator sees no barrier in principle to damages being claimed by Smart King for any losses that it might have suffered as a result of Season Smart's renunciation of the Transaction Agreements, if confirmed by the Tribunal, subject to the usual rules on causation, foreseeability and mitigation.

139. As for Smart King's request for an order that Season Smart cooperate to effect an amendment and restatement of the Smart King Articles, the Emergency Arbitrator considers that Smart King would have a reasonable possibility of persuading the Tribunal that such a remedy was within its powers to grant in order to give effect to the termination of the Transaction Agreements and the consequent discontinuation of Season Smart's consent rights in respect of financing.

140. In summary, the Emergency Arbitrator is of the view that Smart King has established a reasonably arguable case that it can prevail on the merits, including with respect to at least some of the relief that it seeks from the Tribunal.

---

[62]     Reply, paragraph 34.

**(3)     Urgency and the need to avoid irreparable harm**

141.    Urgency is a key criterion for consideration of an application for Emergency Relief, and an applicant under the HKIAC Rules must show, pursuant to Article 2(d) of the Emergency Arbitrator Procedures, that it needs the Emergency Relief on an urgent basis that cannot await the constitution of the Tribunal. In practice, the applicant must show that the relief is required on an urgent basis that cannot await a grant of interim relief by the Tribunal yet to be constituted. The concept of urgency is often considered together with the question of irreparable harm: in other words the Emergency Arbitrator should ask whether the Emergency Relief was urgently required to prevent irreparable harm to the applicant.

142.    Smart King submitted that it needed interim relief urgently because without a rapid injection of funds to cover its ongoing expenses it risked being insolvent by the end of October 2018. Smart King submitted that its urgent need for funding was self-evident as demonstrated by the Parties' agreement, in the A&C signed in July 2018, to the Accelerated Payment schedule in relation to Season Smart's investments in Smart King.

143.    Michael Agosta, VP of Finance of Faraday, set out in his witness statement a summary of Faraday's current financial commitments and obligations, including a payroll obligation of US$7.9 million every two weeks (US$189.2 million on an annual basis), the need for US$116 million for Faraday to position itself to commence production of the FF 91 vehicle by the December 2018 target date, and an average total payments to suppliers of US$40 million each month, with at the beginning of October 2018 more than US$59 million owed to suppliers considered past due.

144.    As of July 2018, Faraday had projected that it would need approximately US$663 million between August and December 2018 to fund its ongoing expenses and to prepare for manufacture of the FF 91 beginning in December 2018. That is what led to the amendments to the Transaction Agreements encapsulated in the A&C. Mr Agosta also advised that, as of 26 September 2018, Faraday had only US$18.1 million in cash left in its bank accounts.

145.    For all of the above reasons, Mr Agosta opined that Faraday needed an immediate source of alternative financing to continue its operations.

146.    Season Smart in its Response submitted that the Emergency Arbitrator should be cautious before accepting Smart King's unsubstantiated claims about urgency and imminent insolvency, which claims Season Smart noted were easy to make. Season Smart argued that the Emergency Arbitrator should only agree to provide interim relief if he was satisfied about the genuineness of the urgency, and suggested that the applicant had a high threshold to reach in that regard. Season Smart also warned against taking any action that would amount to fashioning an "extra-contractual or extra-legal solution for the parties".[63]

147.    In particular, Season Smart said that the Emergency Arbitrator should approach the allegation of imminent insolvency with a critical eye. For example, the allegation of insolvency in Mr Agosta's witness statement was conditional upon there being no cash infusion.  Mr Agosta, however, referred to other possible sources that would enable

---

[63]     Response, paragraph 12(2).

Faraday to meet payroll on 31 October 2018.[64] In addition, Season Smart also cast doubt on the urgency of Smart King's need for relief by pointing out that Smart King was incurring considerable lawyers' expenses to sue Season Smart, when one would have expected Mr Jia, to whom the benefit of any relief obtained in this Application would likely inure, to expend his own funds to pursue Season Smart.

148. The Emergency Arbitrator agrees with Smart King's response on this point in its Reply, in other words that even if any of the other potential sources of funds referred to by Mr Agosta eventuated, it was unlikely to be sufficient to cover Smart King's near-term financial needs.[65] The Emergency Arbitrator also does not consider that Smart King's decision to appoint counsel to prosecute its claims should be read as a sign that Smart King is not in urgent need of funding.

149. The Emergency Arbitrator also agrees with Smart King's submission that the question of urgency is prima facie established given that the Parties agreed in the A&C that Smart King needed funding more urgently than previously contemplated, with the first Accelerated Payment of US$300 million scheduled to be made by Season Smart by 31 July 2018. That cash injection has not been made, which clearly leaves Smart King in a difficult position given the type of financial commitments indicated by Mr Agosta in his witness statement, even if the Emergency Arbitrator does not have the benefit of a neutral assessment to confirm whether Smart King is actually facing the threat of insolvency and, if so, how imminent that threat is.

150. The test for urgency under the Emergency Arbitrator Procedures is whether the relief is so urgent that it cannot wait the establishment of the Tribunal in this arbitration. Assuming that this arbitration is not submitted to resolution under the Expedited Procedure, it is expected that the establishment of the three-person Tribunal envisaged by Section 16.6 of the SHA and any issuance of interim relief by that Tribunal is unlikely to take place before the end of November 2018 at the earliest.[66] It is possible that, as Season Smart submits, other interim solutions can be found for Smart King's financial problems and that insolvency is not as imminent as Smart King alleges, in which case Smart King should be able to wait until the Tribunal is constituted and then ask that Tribunal for the interim relief if it is still needed. However, the Emergency Arbitrator is persuaded, from the evidence provided by Smart King, that the risk of harm is sufficiently real and imminent that it would be imprudent to conclude that the matter can wait. As submitted by Smart King, being driven out of business is likely to constitute irreparable harm that cannot be adequately remedied by damages and therefore justifies serious consideration of an award of interim relief.[67]

151. The prospect of imminent insolvency is just one possible example of irreparable harm that Smart King says it might face if it does not receive the Emergency Relief it seeks. As indicated by the wording of Article 23.4(a) of the HKIAC Rules, the question of urgency is not considered in a vacuum and the applicant must show that the Emergency Relief requested is necessary to avoid irreparable harm.

152. Smart King pointed out that, in light of the provisions of Section 16.9 of the SHA, the Parties had specifically agreed that damages would not be an adequate remedy for breach or non-performance of any of the Transaction Agreements and that, therefore, interim injunctive relief could be obtained. Smart King submitted that the Emergency Arbitrator therefore need not consider the element of irreparable harm further, as the

---

[64]   Agosta WS, [26-27].
[65]   Reply, paragraph 2; Agosta WS, [26].
[66]   T89/25 – T90/1.
[67]   For example, *Walsh v Bank of Scotland plc* [2012] NIQB 36, **CL-10**.

Parties had effectively waived it by agreement. The relevant second paragraph of Section 16.9 provides as follows:

> Without limiting the foregoing, the Parties hereto acknowledge and agree irreparable harm may occur for which money damages would not be an adequate remedy in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that the Parties shall be entitled to injunction to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement.

153. Season Smart responded that, even if Smart King passed the hurdle of demonstrating that it had a reasonable possibility of succeeding on the merits, the Emergency Arbitrator cannot rely on Section 16.9 of the SHA to grant the orders sought by Smart King. That is because if a party seeks the discretionary remedy of a tribunal, the discretion of whether to grant such a remedy is still that of the tribunal, or the Emergency Arbitrator in the present case, and cannot be ousted by mere agreement.

154. In any event, argued Season Smart, Section 16.9 was not incorporated into the A&C. Further, even if Section 16.9 were engaged, Season Smart submitted that the scope of the section was limited to injunctions to prevent breaches of the SHA and to enforce specifically the terms and provisions of the SHA, and the interim relief now sought by Smart King was neither intended to prevent breach of the A&C nor to enforce it. Smart King was not seeking payment of the US$300 million by Season Smart (the alleged breach); the key order sought was rather to suspend and alter the contractual provisions in the SHA. The relief sought was therefore, submitted Season Smart, outside the scope of Section 16.9 and Smart King could not rely on that provision to support its claim for Emergency Relief.

155. The Emergency Arbitrator does not necessarily agree with Season Smart that Section 16.9 is not part of the A&C. The A&C was signed to amend the SHA and the Merger Agreement, and Section 7 of the A&C makes it clear that, except as set forth in the A&C, the terms of the SHA and Merger Agreement shall remain in full force and effect. In other words, an allegation of breach of the A&C might also be characterised as an allegation of breach of the SHA, as modified by the A&C, or of the Merger Agreement, as modified by the A&C, as the case may be. If the Tribunal accepted that analysis, Smart King could therefore very well be found to have the right to invoke the provisions of Section 16.9 in its allegation of breach.

156. Having said that, the Emergency Arbitrator agrees with Season Smart that the provisions of Section 16.9 are unlikely to be held to effect a waiver of the need to consider the element of irreparable harm. The wording of Section 16.9 does not remove the Emergency Arbitrator's discretion to determine whether irreparable harm might occur for which money damages would not be an adequate remedy. It merely confirms the right of a party to apply for an injunction to prevent breaches of an agreement, after which the Emergency Arbitrator would apply the usual criteria to assess whether injunctive relief should in fact be granted. The Emergency Arbitrator also agrees with Season Smart that Section 16.9 is probably not applicable in the present case because the Emergency Relief requested by Smart King is not, strictly speaking, to prevent breaches of, or to enforce the terms and provisions of, the SHA (as amended by the A&C).

157. The Emergency Arbitrator will therefore need to examine whether irreparable harm is likely to be suffered by Smart King if the Emergency Relief is not granted, and whether that harm cannot be adequately remedied by damages. The first thing to note is that in commercial cases it may be very difficult to demonstrate truly "irreparable" harm that

cannot be compensated by money damages in a final award. Many arbitration practitioners suggest that a more realistic approach is to apply the threshold of "serious" harm, and that it would suffice for an applicant to show that if the interim relief were not ordered, the losses the applicant would suffer might not be fully reparable by a subsequent award of damages.[68]

158. In any case, Smart King's position is that the damage it will suffer if it does not access external funding as soon as possible will indeed not just be serious but irreparable, since the company is facing imminent insolvency. If insolvency does indeed eventuate, Smart King argued that a damages award was unlikely to adequately remedy its loss, in particular because if Smart King becomes insolvent it will almost definitely lose the narrow-window opportunity to launch its FF 91 electric vehicle on the market ahead of electric vehicles being developed by competitors.

159. Apart from the threat of insolvency, Smart King's witness Michael Agosta set out in his witness statement other examples of irreparable harm that Smart King would suffer if it did not urgently receive a cash injection. These included the fact that Faraday would be obliged to lay off all of its 1,704 employees absent sufficient funding. Furthermore, as a result of the "payment stoppage", Mr Agosta reported that key suppliers were already beginning to abandon Faraday, and they could not easily be replaced. Finally, Mr Agosta addressed the irreparable harm that would be caused by a delayed market entry. He explained that Faraday had always contemplated being second to enter the high-end electric vehicle market after Tesla, and ahead of competitors such as Porsche, BMW, Audi and Mercedes. To do that, Faraday had planned to begin manufacturing the FF 91 in December 2018 and commence sales as soon as possible in 2019, before the market became saturated by the electric vehicles of those competitors, which was expected to happen in about late 2019. Because of Season Smart's failure to make the first Accelerated Payment due under the A&C on 31 July 2018, Mr Agosta said that Faraday will no longer be able to meet the December 2018 target, but might still be able to begin manufacturing by the third quarter of 2019 if it were able to secure additional funding immediately.

160. Based on the evidence discussed above, the Emergency Arbitrator is satisfied that Smart King has made out a reasonably compelling prima facie case for urgency and the risk of irreparable harm if it does not receive additional funding promptly. As noted above, urgency is apparent from the fact that both Parties agreed in July this year to accelerate Season Smart's funding of Smart King by injecting US$700 million in advance of the originally scheduled date for the next payment (February 2019) provided for in Section 5.12 of the Merger Agreement. While it is difficult for Smart King to provide definitive proof that insolvency is imminent and that without funding it will irreversibly lose its opportunity to enter into the electric vehicle market, in the Emergency Arbitrator's opinion Smart King has put forward a persuasive case that those outcomes would be a reasonably likely and rapid consequence of a continued failure to secure funding, and that the harm thereby caused would not be adequately recompensed by an award of damages.

## (4) Proportionality or Balance of Harm

161. It will not, however, be sufficient for Smart King to succeed in this Application merely by showing that it has a reasonable possibility of succeeding on the merits, that Smart King is in urgent need of funding, that it faces insolvency if it does not secure that

---

[68] See Nathalie Voser, Interim Relief in International Arbitration: *The Tendency Towards a More Business-Oriented Approach*, Dispute Resolution International, Vol.1, No.2, December 2007, pp. 181-183.

funding in short order, and that any loss thereby incurred could not be adequately remedied by an award of damages. The Emergency Arbitrator must also consider the second part of the test set out in Article 23.4(a) of the HKIAC Rules, in other words he must assess whether the harm likely to be suffered by Smart King substantially outweighs the harm that is likely to result to Season Smart if the Emergency Relief is granted.

162. As Season Smart pointed out in its Response,[69] the factors to be taken into account in balance of convenience or harm exercise envisaged by Article 23.4(a) have been explored in detail by the courts. As outlined in *Olint*,[70] the factors that a tribunal should take into account will include: (i) the prejudice that Smart King may suffer if no injunction is granted and Season Smart may suffer if it is; (ii) the likelihood of such prejudice actually occurring; (iii) the extent to which the prejudice to Smart King and Season Smart may be compensated by an award of damages or the enforcement of undertakings; (iv) the likelihood of either Party being able to satisfy such an award; and (v) the likelihood that the injunctive relief will turn out to have been wrongly granted or withheld. In other words, in considering the balance of harm or convenience, the task of the Emergency Arbitrator was to assess whether the granting or the withholding of the requested relief was more likely to produce a just result. It was agreed by the Parties that this approach would also be followed in the Hong Kong courts.

163. At the Hearing, counsel for Smart King picked up on point (v) in the preceding paragraph and submitted that the question for the Emergency Arbitrator was: what are the risks that the Emergency Arbitrator might "wrongly" order the suspension of any of Season Smart's consent rights with respect to financing ("wrongly" in the sense that the Tribunal at the merits stage decides in favour of Season Smart on that issue)?[71]

164. There are various other factors that the Emergency Arbitrator must keep in mind when carrying out this balancing exercise. The Emergency Arbitrator must be convinced that the requested relief is not only justified and appropriate, but that it is also the type of relief that he can order given the Parties' existing contractual arrangements and any other provisions of applicable law. In particular, the Emergency Arbitrator needs to keep in mind the overriding principle that any relief ordered must be of an interim or temporary nature. In other words, the Emergency Arbitrator should not do anything to permanently alter the contractual arrangements of the Parties pending the hearing of the merits of the arbitration claims by the Tribunal. As submitted by Season Smart, the Emergency Arbitrator should also make an assessment of the likely utility of the requested relief in remedying or preventing the imminent harm.

165. Season Smart in its Response essentially raised five points against Smart King in relation to the balance of harm assessment: (1) the requested order is not interim or temporary, it will have permanent and irreversible effects and the Emergency Arbitrator has no jurisdiction to make it; (2) there would be no utility in ordering the requested relief; (3) the interim relief sought is unnecessary for a number of reasons; (4) Season Smart will suffer irreparable harm not compensable by damages if the Emergency Relief is granted; and (5) the undertakings offered by Smart King will be ineffective in mitigating the irreparable harm that Season Smart says it will suffer if the Emergency Relief were granted. Season Smart submitted that, taking all these factors into account, the balance of convenience or harm clearly tilted against the granting of the Emergency Relief, and the Emergency Arbitrator must therefore resist the temptation to "do something about" the situation as advocated by Smart King.

---

[69]   Response, paragraph 57 (3) and (4).
[70]   See *Olint*, §16, **CL-8**.
[71]   T50/3-7; T82/15-19; T98/8-19.

166. For the most recent articulation of the Season Smart's position on the above points, it is useful to refer to Season Smart's Response to Revised Request dated 22 October 2018, which addresses the relevant issues in light of the most recent iteration of the Emergency Relief requested by Smart King, i.e., in the Revised Request filed by Smart King on 19 October 2018.

167. On the first point, Season Smart submitted that Smart King was misguided in its repeated conflation of the concepts of (i) relief that is permanent in nature (and hence cannot be an interim measure for the purposes of the HKIAC Rules); and (ii) a relief that is "temporary", "conservative" or "interim" in nature, but which has permanent or irreversible consequences. Season Smart argued that first and foremost, under Article 23 of the HKIAC Rules, the focus is on the measure – whether it is final or interim in nature – and not whether it is a final or interim disposal of the issues in dispute. The Emergency Arbitrator's task is therefore to first look at the requested measure proposed by Smart King and to ask whether it is by nature something that is permanent or interim in nature. A permanent measure is one that, once granted, cannot be undone, regardless of whether it has consequences that are irreversible. Moreover, a permanent measure is one that goes to the Emergency Arbitrator's jurisdiction, whereas the issue of irreversible consequences is a separate matter, going not to jurisdiction but to the balance of convenience or harm.

168. Applying those principles, Season Smart argued that since the order requested by Smart King is in essence an order compelling Season Smart to give consent to a particular course of action and thereby rewrite the Parties' contractual agreements, this would be a permanent measure because the consent once given cannot be "un-given". In support of this proposition, Season Smart drew the Emergency Arbitrator's attention to authority such as *Arbitration in Hong Kong: A Practical Guide*,[72] which referred to SCC Emergency Arbitrations 144/2010 and 010/2012.[73] In addition, in assessing whether the measure was permanent or interim in nature, Season Smart submitted that the law looks at substance and not the form.[74] In other words, one must not just look at the semantics (for example whether the applicant uses the wording "enjoin" or "restrain") but also at the substance to identify the true nature of the requested measure.

169. The Emergency Arbitrator agrees that one needs to be cautious before ordering relief that is in nature more mandatory than prohibitory, but he is not convinced that the relief requested by Smart King, in its final iteration in the Revised Request, is in fact clearly mandatory in nature, at least not the draft order entitled Option 2. Furthermore, as stated by Ma CJ in his commentary on the SCC cases, the real issue is whether "the relief being sought is final (i.e., the relief would effectively provide a final determination of the rights of the parties regarding the dispute)".[75] The Emergency Arbitrator does not consider that the Emergency Relief requested by Smart King would effectively provide a final determination of the rights of, or the key substantive issues between, the Parties in the present dispute, for example as to whether Season Smart had renounced the Transaction Agreements and whether Smart King had a right to terminate those agreements.

---

72    Ma CJ et al, 4th edition, §§12.084-12.085, **RL-34**.
73    **RL-35**.
74    *Hounslow London Borough Council v Twickenham Garden Developments Ltd* [1971] 1 Ch 233, 268 E-H
      (per Megarry J), **RL1-2**.
75    *supra*, 72, at §12-084.

170. On the second argument, that of utility, Season Smart said first that since the same consent rights appeared in Article 49.2 of the Smart King Articles, requiring approval at the shareholder level for Reserved Matters under the SHA, it was difficult to discern any real utility in the requested Emergency Relief. The Emergency Arbitrator notes that that concern now seems to have been resolved since, in its Revised Request, Smart King refers specifically to the provisions of Sections 33.1, 49.2 and Schedule I of the Smart King Articles being covered by the requested order.

171. Further on the utility point, Season Smart argued that in the only expression of interest from a financial institution submitted to date by Smart King (the redacted letter dated 14 October 2018 exhibited at C-107), the interest is expressed to be subject to the removal of Evergrande's consent rights. Therefore, argued Season Smart, an order that merely enjoins Season Smart from exercising its consent rights is unlikely to satisfy potential lenders, who would likely want to see a permanent removal of Season Smart's consent rights. Smart King countered with the evidence of Mr Agosta to the effect that the requested order would indeed give comfort to potential lenders and was "critical to attracting and procuring such external financing".[76] Smart King submitted that given Mr Agosta's decades of experience in financing in the automotive industry, his uncontested evidence should be preferred over the speculations of Season Smart's counsel in this regard.

172. On the related question of necessity, Season Smart submitted that, apart from the vague expression of interest contained in the letter of 14 October 2018, there was simply no financier in sight at the moment, and so ordering the requested relief would be putting the cart before the horse. What Smart King should do instead, suggested Season Smart, was to find a concrete proposal of financing and present it to the Board for its consideration. Granting the Emergency Relief requested would be equivalent to giving Smart King carte blanche to do what it wanted, to the possible detriment of existing shareholders such as Season Smart. Furthermore, Smart King had asserted in its Application that it was confident that, due to its termination of the Transaction Agreements, Season Smart already no longer had the right to exercise any consent rights with respect to financing. Given that position, Season Smart argued that Smart King should have the courage of its convictions and directly seek financing proposals in the market rather than apply for Emergency Relief. Smart King replied that even the risk that Season Smart would attempt to assert its consent rights could be enough to stymie any efforts to procure financing and that Season Smart's submission in fact amounted to asking potential lenders to have the courage of Smart King's convictions, which was unreasonable. Hence the requested Emergency Relief, which was intended to help get an offer of financial assistance on the table for Smart King's Board to consider. Far from being a matter of carte blanche, Smart King argued that it was asking for very limited, targeted relief to prevent Season Smart from effectively playing "spoiler".

173. Season Smart assured the Emergency Arbitrator on several occasions that it was in fact prepared to consider any reasonable proposal for equity financing, but that Smart King had not yet tabled any such proposal. In its latest submission (the Response to Revised Request), Season Smart also reiterated its stance that it had not and would not unreasonably withhold its consent to reasonable debt financing proposals. Further, it said that it was prepared to consider favourably the use of Smart King's Los Angeles headquarters and Nevada manufacturing plant as security in order to enable Smart King to raise funds immediately. In its reply letter dated 23 October 2018 to the Response to Revised Request, Smart King argued that Season Smart's proposal in

---

[76]  WS Agosta, [48].

respect of its liens over Smart King's real property in Los Angeles and Nevada was so heavily qualified as to be meaningless. Furthermore, even if those liens were released, Season Smart's conditions would make it impossible for Smart King to obtain short-term financing. Given Season Smart's actions to date in refusing to comply with its obligations to fund the company, Smart King said that Season Smart's assurances in this regard were hollow and should not be taken at face value.

174. Season Smart's fourth objection was that the Emergency Relief, if ordered, would cause irreparable harm and irremediable prejudice to Season Smart not compensable by damages. Season Smart would be potentially diluted in its shareholding and might have to accept a new shareholder in Smart King that was unacceptable to it. In those circumstances, Season Smart's counsel suggested at the Hearing that Smart King's assurances that Season Smart could be compensated by damages were "vacuous" and "meaningless" because, first, such damages would be very difficult to measure and, secondly, Smart King had not shown that it would be "good for the damages" by, for example, offering to fortify any damages.[77]

175. In response, Smart King submitted that it had difficulty seeing what the irreparable harm might be for Season Smart if the Emergency Relief were ordered. Any diminution in the value of Season Smart's shares could readily be compensable by an award of damages. Furthermore, argued Smart King, the effect of the relief on Season Smart's shareholder rights would be minimal, as Season Smart was only asking for one right (the right to consent or not to finance) to be held in abeyance to enable the company to obtain necessary financing pending resolution of the merits of the dispute, or at least until such time as the Tribunal could reconsider the matter. That, suggested Smart King, amounted to very little when weighed in the balance of the possible imminent insolvency of Smart King. Furthermore, if Season Smart prevailed on the merits, Smart King submitted that all of Season Smart's consent rights would come back immediately into force.[78]

176. The Emergency Arbitrator considers that the risk of prejudice to Season Smart needs to be taken seriously, and particular in relation to any solution that might effect a change in the shareholding of Smart King, which might not be easily reversible if Season Smart prevailed on the merits. The Emergency Arbitrator should also not accept too lightly the assurances by Smart King that the consequences of any Emergency Relief (for example a possible shareholding change in the company) could be remedied by an award of damages. At the same time, the Emergency Arbitrator should also not accept at face value the assurances of Season Smart that it is prepared to seriously consider any reasonable specific proposal to meet the funding needs of Smart King, particularly in light of Season Smart's seeming insouciance in the face of an imminent inability by Smart King to meet its immediate, let alone medium-term, spending obligations.

177. In summary, the assessment of possible harm to Season Smart needs to be balanced against the potential harm to Smart King if the Emergency Relief is not ordered. In that regard, Season Smart urged the Emergency Arbitrator to be wary of Smart King exaggerating the risk of imminent insolvency. However, as noted above, the Emergency Arbitrator is indeed persuaded on the evidence presented to him that there is an imminent risk of economic harm to Smart King including the possibility that Smart King will very soon be unable to pay its debts and day-to-day expenses, in other words the very definition of insolvency. Indeed, as Smart King noted, if the prospect of

---

77   T119/22 – 120/21.
78   T93/19 – 94/1.

imminent insolvency is real, then both Parties will benefit from any reasonable relief that would enable the company to continue as a going concern, and Season Smart would suffer as much as the other shareholders if Smart King became insolvent.[79]

178. At the same time, the balance of harm and proportionality assessment needed to take into account the effect and effectiveness of the undertakings proposed by Smart King in return for its request for Emergency Relief, in other words the fifth point of objection raised by Season Smart. That question will be examined in the paragraphs below.

179. Season Smart contended that the undertakings offered by Smart King would be ineffective in mitigating the irreparable harm that Season Smart says it will suffer, and were another example of putting the cart before the horse. Moreover, in the absence of a specific financing proposal, it was difficult to assess what kind of protections might be necessary in order to hold the balance between the Parties.[80]

180. Smart King responded, first, that in relation to the assessment of the balance of harm, it went without saying that there was no guarantee that Season Smart would not be harmed at all by the granting of the Emergency Relief. Further, that the undertakings were also not designed to prevent Season Smart from suffering any harm at all, but to mitigate that harm. For example, Smart King's undertaking regarding dilution was not designed to prevent any dilution whatsoever, but to ensure that any dilution would be shared proportionately with other classes of shareholders. With respect to the undertaking as to the protection of the value of Season Smart's shares, in response to Season Smart's complaints that the original relevant undertaking did not take into account the US$800 million that Season Smart had already invested into the company, Smart King's counsel gave an assurance at the Hearing that Smart King was happy to give that further undertaking.[81] As for the financing cap undertaking, Smart King submitted that Season Smart had not addressed the effectiveness of this condition directly, and had merely reiterated its view that Smart King should be not granted any relief at all with respect to the sourcing of financing.

181. Following directions from the Emergency Arbitrator at the Hearing, Smart King modified its undertakings in its Revised Request, with the original undertakings now reframed as "conditions" to any acceptable financing proposal (**Proposal**). These modified "conditions" were addressed by Season Smart at paragraph 10 of its Response to Revised Request. With respect to the first undertaking or "condition", to the effect that any Proposal would need to be approved by a majority of the Board, Season Smart argued that this was meaningless in terms of protection, because Mr Jia had control of five directors, whereas Season Smart only had two, and that once Season Smart lost its protection of positive consent under the Reserved Matters, Mr Jia would be able to push through any proposal he saw fit.

182. With respect to new condition (ii), which revised the total fundraising cap for alternative debt or equity financing down from the US$700 million requested in the Application to a new cap of US$500 million, Season Smart noted that this still represented a substantial interest in Smart King (about 11% on an undiluted basis). Moreover, Season Smart pointed out that the potential prejudice to Season Smart was compounded by the fact that it remained unclear what rights (for example voting rights, rights to appoint directors and reserved matter rights) would attach to that substantial interest.

---

79      T95/23-25.
80      T206/9-22; T240/18-25.
81      T95/5-8.

183. With respect to new condition (iii), Season Smart objected to the formulation on the grounds of internal inconsistency and unreasonableness. Notably, Season Smart said that paragraph A of condition (iii) only addressed dilution of shareholding but was completely silent on the rights attached to each class of shares. Paragraph C of condition (iii) would give Season Smart certain preemptive rights to purchase shares at the same price of any newly issued equity offered to a potential investor, up to such number of shares as would be necessary to maintain Season Smart's stake in Smart King. The existence of paragraph C, submitted Season Smart, cast doubt on the credibility of Smart King's assertion that there would not be disproportionate dilution. As for paragraph B, Season Smart noted that the minimum price-per-share was, as in the Application, based on the valuation of Smart King as at the time Season Smart agreed to invest in the company in November 2017 (i.e., around US$4.5 billion) and still failed to take into account Season Smart's subsequent injection of US$800 million into Smart King.

184. As a general comment, the Emergency Arbitrator is of the view that the reformulated options set out in the Revised Request, including the redrafted "conditions" to replace the original undertakings, do address some of the concerns raised by Season Smart and also by the Emergency Arbitrator at the Hearing. The Revised Request presents options that are clearer and more workable than the Emergency Relief requested in the Application, and which should result in less prejudice to Season Smart. For example, the Revised Request addresses Season Smart's "cart before the horse" argument and its complaint that there was no actual financing proposal to assess, by focusing the relief on potential Proposals that have to meet certain conditions before they can be considered by the Board. The Revised Request also enhances Season Smart's preemptive rights to purchase shares at the same price offered to a potential investor and up to the number of shares necessary to maintain its stake in Smart King. These modifications go some way to addressing Season Smart's concerns about unreasonable dilution and should also provide an effective means for Season Smart to exercise its preemptive rights and block the entry of any unwanted new shareholder into Smart King. In that regard, the Emergency Arbitrator does not agree with Season Smart that the preemptive rights in paragraph C somehow call into question Smart King's assurances that there would not be disproportionate dilution. Rather, the preemptive rights provide protection to Season Smart additional to that given by the assurance on equal dilution among the shareholders given in paragraph A.

185. Furthermore, the reduction of the fundraising cap in the Revised Request means that the total amount of external funding would be limited to US$500 million, in other words the equivalent of only the first two Accelerated Payments envisaged in the A&C (the 31 July 2018 and 31 October 2018 payments) rather than the original US$700 million, which was the equivalent of all three Accelerated Payments, including the payment due on 31 January 2019, as contemplated under the original request for Emergency Relief. The revised and reduced cap more closely reflects the amount of funds that the Parties envisaged would be needed urgently by Smart King during 2018 and should allow the company to be adequately funded until such time as the Tribunal is constituted in this arbitration.

186. What the Revised Request does not appear to address is Season Smart's concern that the minimum price per share that a potential investor must pay should be based on a valuation of Smart King that takes into account the US$800 million that Season Smart has invested into the company since it became a shareholder in November 2017. This concern would need to be taken into account and addressed in any Emergency Relief ordered by the Emergency Arbitrator.

187. As long as that concern is dealt with, the Emergency Arbitrator is satisfied that, having considered the potential harm that would be caused to Smart King by not ordering the Emergency Relief against the potential harm that would be caused to Season Smart if the Emergency Relief were ordered, the balance of convenience in the present Application falls in favour of Smart King rather than Season Smart. In other words, if Season Smart prevails on the merits, meaning that this Award was wrongly decided and the Emergency Relief wrongly granted, the risk of any harm thereby caused to Smart Season by that wrong decision is substantially outweighed by the risks of immediate harm to Smart King if the Emergency Relief requested is not granted, including the risk of imminent insolvency.

188. With respect to the three options proposed by Smart King in the Revised Request, in the Emergency Arbitrator's opinion Option 2 is the most appropriate one. This is because Option 2 is expressed in a non-mandatory manner, in that it provides that the entering into of a Proposal that meets the required conditions will not be deemed to be a Reserved Matter, to the extent it otherwise would. By contrast, Option 1 enjoins Season Smart from exercising its consent rights and Option 3 requires Season Smart to positively approve a Proposal that meets the required conditions. These two options are thus arguably more mandatory in nature than Option 2 (even if Option 1 uses the word "enjoin"). The Emergency Arbitrator does not consider this to be merely a question of semantics. For example, the wording of Option 2 should address some of Season Smart's concerns, in particular that consent or approval, once given, cannot be "un-given", which would potentially be an issue if the wording of Option 1 or Option 3 were adopted. Furthermore, in the Emergency Arbitrator's view the suspended "Purported Consent Rights" will be more easily restored under Option 2 than under the other two options if Season Smart prevails on the merits.

189. For all of the above reasons, the Emergency Arbitrator is therefore minded to grant the Emergency Relief in the form of the draft of Option 2 in the Revised Request, with a minor modification to address the need to take into account Season Smart's further injection into Smart King of US$800 million in Subscription Payments since Season Smart joined the company as a shareholder in November 2017. That minor modification will be written into the order set out in the Operative Part below.

## VIII. SUMMARY OF EMERGENCY ARBITRATOR'S FINDINGS

190. The Emergency Arbitrator's key findings in relation to Smart King's application for Emergency Relief can be summarised as follows:

   a. The Emergency Arbitrator has jurisdiction over Smart King's Application for Emergency Relief;

   b. Smart King has established a prima facie case that it has a reasonable possibility of succeeding on the merits in the present arbitration;

   c. Smart King needs the Emergency Relief on an urgent basis that cannot await the constitution of the arbitral tribunal in these arbitration proceedings;

   d. Harm not adequately reparable by an award of damages is likely to result if the Emergency Relief is not ordered, and such harm substantially outweighs the harm that is likely to result to Season Smart if the Emergency Relief is granted;

   e. the Emergency Relief is necessary to maintain the status quo pending the determination of the Parties' disputes and is necessary to prevent any harm or prejudice to the arbitral process;

f.  the Emergency Relief as requested under Option 2 of the Revised Request dated 20 October 2018 shall therefore be ordered, with a minor modification to reflect Season Smart's reasonable concerns about the valuation of its shares in Smart King.

## IX. COSTS

191. The Parties submitted their respective costs submissions on 23 October 2018.

192. The relevant paragraph 15 of the Emergency Arbitration Procedures provides:

> Any Emergency Decision shall fix the costs of the Emergency Relief proceedings and decide which of the parties shall bear them or in what proportion they shall be borne by the parties, subject always to the power of the arbitral tribunal to determine finally the apportionment of such costs in accordance with Article 33 of the Rules. The costs of the Emergency Relief proceedings include HKIAC's administrative expenses, the Emergency Arbitrator's fees and expenses and the reasonable and other legal costs incurred by the parties for the Emergency Relief proceedings.

193. In addition, under Section 74 of the Hong Kong Arbitration Ordinance Cap. 609 (**Ordinance**), the Tribunal has a broad discretion in respect to the assessment and apportionment of the costs of these proceedings, including the fees and expenses of the Tribunal. What is recoverable under the Ordinance would be what is reasonable having regard to all the circumstances. That is the overarching principle enunciated by Section 74(7) of the Ordinance.

194. The costs of this Application therefore include:

a.  the costs for legal representation and expenses claimed by the Parties, to the extent the Emergency Arbitrator determines that the amount of such costs is reasonable (**Legal and Related Costs**);

b.  the fees and expenses of the Emergency Arbitrator (**Emergency Arbitrator's Fees and Expenses**); and

c.  the administrative fees payable to the HKIAC (**HKIAC Fees**).

195. Under Section 74(6) of the Ordinance, the Emergency Arbitrator is not obliged to follow the scales and practices adopted by the Hong Kong courts. Nevertheless, arbitral tribunals in Hong Kong will usually follow the Hong Kong court practice, which is also common in international arbitration proceedings, of applying the principle of "costs follow the event". This principle is reinforced in the present case by the provisions of Section 16.8 of the SHA, which provides that:

> If any action at law or in equity is necessary to enforce or interpret the terms of this Agreement, the prevailing Party shall be entitled to reasonable attorneys' fees, costs and necessary disbursements in addition to any other relief to which such Party may be entitled.

196. That means that the losing party will normally pay the winning party its "reasonable" costs, including its Legal and Related Costs and the Emergency Arbitrator's Fees and Expenses, unless the Emergency Arbitrator considers there is any reason why this should not be the case (for example, if the unsuccessful party has incurred unnecessary costs and expenses by virtue of the successful party's conduct during the

43

proceedings). A successful party may also be denied recovery of some of its costs if it has failed on any discrete issues.

197. Applying the above principles, the starting point is that Smart King was largely successful in this Application for Emergency Relief. Accordingly, subject to any findings as to unreasonable conduct of the proceedings by Smart King or a reduction in recovery of costs due to Smart King's failure on a number of discrete issues, Season Smart should in principle reimburse Smart King for all of its reasonable costs incurred in relation to these proceedings.

198. In the event that Smart King succeeded wholly or partly in its Application, Season Smart submitted that the following factors should be taken into account in awarding any costs to Smart King:

    a.    the extent to which the order for Emergency Relief granted differed in any way from the draft order set out in paragraph 170(a) of the Application or in the Revised Request dated 19 October 2018, since any amendment would mean that Smart King had not "succeeded", or not succeeded completely, and any costs to be awarded should reflect that.

    b.    Smart King should bear a portion of the costs of these proceedings and on an indemnity basis in any event, given that unnecessary costs were incurred with respect to Smart King's New Application for release of security, which was dismissed by the Emergency Arbitrator on 22 October 2018 with costs reserved.

    c.    Smart King should bear a portion of the costs related to its late amendment of the Emergency Relief it sought.

199. The Emergency Arbitrator's task is to determine whether the amount of Legal Fees and Expenses claimed by Smart King were reasonable for this kind of urgent application for Emergency Relief, taking into account the various factors referred to by Season Smart above. Smart King has claimed the following amounts for Legal and Related Costs: HK$7,134,740 for legal fees, HK$115,397.49 for disbursements and HK$23,883.53 for Hearing costs, for a total of HK$7,274,021.02.

200. Having considered all relevant factors, including the fact that the physical hearing of 18 October 2018 was, as pointed out by Smart King, held solely at Season Smart's insistence, the Emergency Arbitrator considers that the Legal and Related Costs claimed by Smart King were reasonable, particularly when compared with the Legal and Related Costs claimed by Season Smart, which were approximately double those claimed by Smart King. Nevertheless, Season Smart is correct that certain additional costs have been incurred (by all Parties) as a result of Smart King's late New Application for release of security and late amendment of the Emergency Relief it sought. The Emergency Arbitrator will therefore apply a 25% reduction to the Legal and Related Costs claimed by Smart King and order Season Smart to pay the amount of HK$5,455,515.76 towards those costs. Adopting the costs follow the event principle, Season Smart shall bear all its own Legal and Related Costs in relation to the Application.

201. The Second Respondent Mr Jia has also claimed Legal and Related Costs of US$77,755.90, which it submitted should be reimbursed by Season Smart if Smart King prevailed, or substantially prevailed, in its Application. In response, Season Smart argued that it should in no circumstances be liable to pay any of Mr Jia's costs since,

as the Emergency Arbitrator had pointed out, Mr Jia was not really an active party to the Application, there being no Emergency Relief sought by or against him.[82] In that sense, submitted Season Smart, Mr Jia's participation in the Application was entirely gratuitous.

202. The Emergency Arbitrator is of the view, for the reasons articulated by Season Smart and set out above, that it would not be appropriate to make a costs order in favour of Mr Jia for his costs in relation to the Application, and Mr Jia shall therefore bear all his own Legal and Related Costs.

203. The Emergency Arbitrator's Fees and Expenses consist only of his fees of HK$390,000 (65 hours at his hourly rate of HK$6,000). This amount is covered by the total deposits already paid by Smart King for the Emergency Arbitrator's Fees and Expenses of HK$405,000. The Emergency Arbitrator will forgo any claim for expenses. Applying the costs follow the event principle, the Emergency Arbitrator determines that Season Smart will be ordered to reimburse Smart King for the entirety of the Emergency Arbitrator's Fees and Expenses in the amount of HK$390,000.

204. The HKIAC Fees consist of a Registration Fee of HK$8,000 and the Emergency Arbitrator HKIAC Administration Fee of HK$45,000, both of which have been paid by Smart King. Again, applying the costs follow the event principle, Season Smart will be ordered to reimburse Smart King the sum of HK$53,000 in relation to HKIAC Fees.

205. Finally, Smart King has claimed interest in respect of its claim for costs. The Emergency Arbitrator notes that, under Sections 80(1) and (3) of the Ordinance, in the absence of an order or award by the tribunal to the contrary, the winning party is entitled to recover post-award interest at the judgement debt rate. In principle, interest can be awarded in respect of costs awards. Nevertheless, in the particular circumstances of these Emergency Relief proceedings, and in particular given the fact that this arbitration is likely to proceed promptly to the merits stage, with the Tribunal to be appointed to have final say over the apportionment of the Parties' costs throughout this arbitration matter, the Emergency Arbitrator decides in his discretion to make no award for interest in respect of the costs that he has awarded in Smart King's favour.

## X.   OPERATIVE PART

206. The Emergency Arbitrator therefore AWARDS, ORDERS, AND DIRECTS as follows:

    a.   The Emergency Arbitrator has jurisdiction over Smart King's Application for Emergency Relief in these proceedings.

    b.   Until a Final Award is rendered by the Tribunal to be constituted pursuant to the Notice of Arbitration filed with the Claimant's Application for Emergency Relief, or such earlier time as determined by the Tribunal, the entering into of a proposal (the **Proposal**) which meets the conditions set out below will be deemed not to be a Reserved Matter for the purposes of Section 8 and Schedule II of the SHA and Sections 33.1 and 49.2 and Schedule I of the Smart King Articles of Association (the **Purported Consent Rights**), to the extent it otherwise would. The conditions are as follows:

        i.   The Proposal has been approved by a majority of Smart King's board of directors;

---

[82]    T101/15-23.

    ii.   The total value of alternative debt or equity financing entered into by Smart King which would, but for this Order, otherwise be subject to the Purported Consent Rights (if those rights remain on foot, a matter on which this Order does not take a view) is capped at US$500 million;

    iii.  If the Proposal involves issuing new equity securities:

        1.   The Proposal will not have the effect of diluting Season Smart's shareholding disproportionately to other classes of shareholders;

        2.   The Proposal will be based on a price-per-share that is no less than the current value of Season Smart's shares, taking into account the price-per-share that Season Smart agreed to invest at in November 2017 as well as the US$800 million in Subscription Payments that Season Smart has made since that date (the *Minimum PPS*). If the potential investor is unwilling to pay the Minimum PPS, then the Proposal may allow for any existing shareholder to sell its shares to the potential investor at such price as is necessary to ensure that the overall Proposal for the new equity raise is based on the Minimum PPS;

        3.   The Proposal will include preemptive rights in favour of Season Smart, meaning specifically that, under the Proposal, Season Smart shall have the right to purchase shares at the same price of the newly issued equity as offered to the potential investor, up to such number of shares as would be necessary to maintain its stake in Smart King.

c.    Season Smart shall pay to Smart King HK$5,455,515.76 in respect of Smart King's Legal and Related Costs.

d.    Season Smart shall pay to Smart King HK$390,000.00 in respect of the Emergency Arbitrator's Fees and Expenses.

e.    Season Smart shall pay to Smart King HK$53,000.00 in respect of HKIAC Fees.

f.    All other claims and requests are dismissed.

(Signature page to follow)

Place of the emergency arbitrator proceedings: Hong Kong SAR

Date: 25 October 2018



Mr Peter Thorp
Emergency Arbitrator

# EXHIBIT B

*Hong Kong Exchanges and Clearing Limited and The Stock Exchange of Hong Kong Limited take no responsibility for the contents of this announcement, make no representation as to its accuracy or completeness and expressly disclaim any liability whatsoever for any loss howsoever arising from or in reliance upon the whole or any part of the contents of this announcement.*



# EVERGRANDE HEALTH INDUSTRY GROUP LIMITED
# 恒大健康產業集團有限公司

(a company incorporated in Hong Kong with limited liability)
**(Stock code: 708)**

### INSIDE INFORMATION

This announcement is made by Evergrande Health Industry Group Limited (the "Company") pursuant to Rule 13.09 of the Rules Governing the Listing of Securities on the Stock Exchange of Hong Kong Limited (the "Listing Rules") and Part XIVA of the Securities and Futures Ordinance (Cap.571).

Reference is made to the announcements of the Company dated 25 June 2018 and 7 October 2018. Unless context requires otherwise, capitalised terms shall bear the same meanings as defined in the aforesaid announcements.

On 25 October 2018, Season Smart received the result of the emergency arbitration. The arbitrator has not accepted Smart King's application for a complete enjoinment of Season Smart's consent right in respect of financing, and has previously rejected the new application of Smart King to release the security held by Season Smart.

As an interim relief to support Smart King's development and protect shareholders' interests, the arbitrator allowed Smart King to proceed with financing under stringent conditions, including: the valuation of any equity financing shall not be lower than post-money valuation, Season Smart continues to enjoy pre-emptive rights and pending the outcome of the final arbitration, obtain financing at a capped amount of US$500 million.

Shareholders and potential investors are advised to exercise caution when dealing in the securities of the Company.

**By Order of the Board**
**Evergrande Health Industry Group Limited**
**Shi Shouming**
*Chairman*

Hong Kong, 25 October 2018

*As at the date of this announcement, the executive directors of the Company are Mr. SHI Shouming, Mr. PENG Jianjun and Mr. LI Siquan; and the independent non-executive directors of the Company are Mr. CHAU Shing Yim, David, Mr. GUO Jianwen and Mr. XIE Wu.*

# EXHIBIT C

CAPITAL MARKETS    ASIA OUTBOUND    PEOPLE    RETAIL    DESIGN & CONSTRUCTION    LOGISTICS

RESEARCH & POLICY    FLEXIBLE OFFICE    PROPTECH    ADVERTISE

# FARADAY FUTURE LOSES BID TO TERMINATE $2B EVERGRANDE DEAL

2018/10/28 BY **MICHAEL COLE** — **LEAVE A COMMENT**

A request from Jia Yueting's Faraday Future asking an arbitrator to void its $2 billion investment agreement with a unit of Evergrande Health Industry Group was rejected late last week, keeping the unit of China's largest property developer by sales in control of the troubled electric car maker.



So far, Jia Yueting has produced more conflict than cars at Faraday Future

The Hong Kong Arbitration Center upheld Evergrande Health's role in approving new financing for Faraday, according to an account in mainland news site thepaper.cn, during the same week that the flailing supercar maker was reported to be laying off staff and cutting salaries of remaining team members across the board.

The judgement came less than three weeks after Faraday had brought the case against the property developer controlled by mainland billionaire claiming that Evergrande had failed to make good on a promised $500 million cash injection.

## Faraday Claims Victory as Request Denied

In a social media post, California-based Faraday put a brave face on the decision, which has yet to be publicly announced by the dispute resolution body, saying, "The arbitrators have ruled that Evergrande may no longer stop Faraday from getting money from other sources of financing in future." While the arbitrator's ruling maintained Evergrande's control in deciding terms of any financing, Faraday indicated that it will begin worldwide search for a bailout.

"An only $500 million external credit line was granted to Faraday Future, with requirements for lender's valuations also imposed, which means (the allowed amount) will merely enable the company to survive. The carmaker's use of the ruling for commercial exploitation is just puffing up its cheeks for appearances sake," a senior financial staffer from Faraday was cited as saying in an account in Shanghai-based business site Yicai Global.

The arbitrator's ruling was said to allow Faraday to seek the $500 million credit line on the grounds that the company is on the verge of bankruptcy.

## Car Maker Conflict Picks Up Speed

Since Faraday asked for arbitration, the conflict between the car maker and its new owner had escalated to near-open warfare. News reports indicated that Faraday Future staff had refused to hand over the company seal and finance seal of two Faraday subsidiaries on the mainland, and an employee had sued Evergrande FF China, a local unit of the company for damaging their reputation, demanding an apology and RMB 10,000 as compensation for psychological damage.



Faraday has said that it hopes to begin producing its first car next year

On October 22nd, Faraday Future announced that all staff would need to take a 20 percent pay cut, and some team members would be laid off, because of what it said was a failure by Evergrande to meet its financial obligations to the company.

## Evergrande Ownership Upheld

Faraday had been seeking $500 million in fresh cash from Evergrande when it brought the arbitration complaint, after the property developer had paid $860 million in June to take a controlling 45 percent stake in the company, which has yet to begin production of its first vehicle.

That investment was in addition to an earlier $800 million that Evergrande had paid in may to take control of the company's new production base in Guangdong province, with a commitment to invest another $600 million into the business in 2019 and 2020.

Evergrande Health announced its own account of the arbitrator's ruling to the Hong Kong stock exchange on Friday, noting that Faraday was only allowed to seek new financing "under stringent conditions" and that Evergrande "continues to enjoy pre-emptive rights."

## Related Posts



Evergrande Takes the Wheel at Faraday Future With $2B EV Investment



Evergrande's $2B Investment in Faraday May Have a Limited Future



Evergrande Said to Bet $300M on Jia Yueting's Faraday Future



China Evergrande Paying Up to 13.75% for $1.8B in Bonds and More Asia Real Estate Headlines

FILED UNDER: FINANCE

TAGGED WITH: CHINA EVERGRANDE GROUP, DAILY-SP, EVERGRANDE HEALTH INDUSTRY GROUP, FARADAY FUTURE, JIA YUETING

## Leave a Reply

Your email address will not be published. Required fields are marked *

Comment

# EXHIBIT D

## SHAREHOLDERS AGREEMENT

THIS AMENDED AND RESTATED SHAREHOLDERS AGREEMENT (this "Agreement") is entered into with effect on November 30, 2017 (the "Effective Date") by and among

1. Smart King Ltd., an exempted company with limited liability incorporated under the Laws of the Cayman Islands, whose registered office is at the offices of Walkers Corporate Limited, Cayman Corporate Centre, 27 Hospital Road, George Town, Grand Cayman KY1-9008, Cayman Islands (the "Company");

2. FF Top Holding Ltd., a BVI business company established under the Laws of British Virgin Islands, whose registered office is at the offices of Sertus Incorporations (BVI) Limited, Sertus Chambers, P.O. Box 905, Quastisky Building, Road Town, Tortola, British Virgin Islands  (the "Founder HoldCo");

3. JIA Yueting, of 7, Marguerite Dr., Rancho Palos Verdes, CA, United States , a resident of the People's Republic of China with identity card no. 14262319731215081X (the "Founder");

4. Season Smart Limited, a BVI business company established under the Laws of British Virgin Islands, whose registered office is at the offices of Vistra Corporate Services Centre, Wickhams Cay II, Road Town, Tortola, VG1110, British Virgin Islands (the "Series A Investor"),

and each of the parties to this Agreement is referred to herein individually as a "Party" and collectively as the "Parties". Capitalized terms used herein without definition shall have the meanings set forth in the Subscription Agreement (as defined below).

## RECITALS

A. Pursuant to an Agreement and Plan of Merger and Subscription dated November 30, 2017 by and among the Company, the Cayman Company(as defined below), Founder TopCo, Series A Investor, Founder HoldCo and Founder (the "Subscription Agreement"), the Series A Investor has agreed, subject to the terms and conditions of the Subscription Agreement, to invest US$2,000,000,000 in the Company on the payment schedule set forth in Section 5.12(a) of the Subscription Agreement in exchange for Class A Preferred Shares (as defined below) of the Company that are subject to forfeiture as set forth in Section 5.12(e) of the Subscription Agreement.

B. As of the First Closing and the Second Closing, the Company will own 100% of the outstanding equity of FF Global Holdings Ltd, an exempted company limited by shares incorporated under the Laws of Cayman Islands (the "Cayman Company").

C. As of the First Closing, the Shareholders will comprise of the Founder HoldCo, the Series A Investor and (following the execution and delivery of the applicable documents set forth in the Subscription Agreement) the Ordinary Employee Shareholders. Details of their respective shareholdings in the Company as of the First Closing are set out in the schedule to be delivered by the Founder HoldCo to the other Parties prior to First Closing in the agreed form (and which will comprise Schedule I hereto as at First Closing).

1

16.     **Miscellaneous.**

16.1     **Effective Date.** This Agreement will take effect from the date of the First Closing save that Section 16 and Section 10.3(c) shall take effect from the date of this Agreement.

16.2     **Termination**. This Agreement shall terminate upon mutual consent in writing of the Majority Class A Preferred Shareholders and the Founder Holdco.   The provisions of Section 12 shall terminate upon the consummation of a Qualified IPO.   If this Agreement terminates, the Parties shall be released from their obligations under this Agreement, except in respect of any obligation stated to continue to exist after the termination of this Agreement (being Section 1, Section 10.8 and Section 10.9, Section 16.4, Section 16.5 to Section 16.15, Section 16.17, Section 16.20 to Section 16.23). If any Party breaches this Agreement before the termination of this Agreement, it shall not be released from its obligations arising from such breach on termination. This Agreement shall terminate as between any Shareholder and the other Parties at any time when such Shareholder ceases to be a shareholder of the Company following a Transfer in compliance with the provisions of this Agreement.

16.3     **Further Assurances.** Upon the terms and subject to the conditions herein, each of the Parties hereto agrees to take and to procure (to the extent within its control) that each of its Affiliates and each Group Company shall take all action, to do or cause to be done, to execute such further instruments, and to assist and cooperate with the other Parties hereto in doing, all things necessary, proper or advisable under applicable Laws or otherwise to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated by this Agreement, to give effect to its obligations under this Agreement and / or secure to each other Party the benefit of the rights conferred on such other Party by this Agreement.

16.4     **Assignments and Transfers; No Third Party Beneficiaries.** Except as otherwise provided herein, this Agreement and the rights and obligations of the Parties hereunder shall inure to the benefit of, and be binding upon, their respective permitted successors, assigns and legal representatives, but shall not otherwise be for the benefit of any third party. Other than as expressly provided herein, this Agreement and the rights and obligations of the Parties hereunder shall not otherwise be assigned.

16.5     **Governing Law.** This Agreement is governed by and shall be construed under the Laws of Hong Kong, without regard to principles of conflict of laws thereunder.

16.6     **Dispute Resolution.**

(a)     Any dispute, controversy, difference or claim (each, a "Dispute") arising out of or relating to this Agreement, or the interpretation, performance, breach, termination, existence, validity or invalidity thereof, or any Dispute regarding non-contractual obligations arising out of or relating to it shall be referred to and finally resolved by arbitration administered by the Hong Kong International Arbitration Centre (the "HKIAC") under the HKIAC Administered Arbitration Rules (the "HKIAC Rules") in force when the notice of arbitration is submitted by one party to another.

(b)     The law of this arbitration clause shall be Hong Kong law.  The seat of arbitration shall be Hong Kong.  The number of arbitrators shall be three (3). All of the arbitrators shall be qualified to practice law in Hong Kong.

(c)     The arbitration proceedings shall be conducted in English and Mandarin. To the extent that the HKIAC Rules are in conflict with the provisions of this Section 16.6, including the provisions concerning the appointment of the arbitrators, the provisions of this Section 16.6 shall prevail.

(d)     The award of the arbitral tribunal shall be final and binding upon the parties thereto, and the prevailing party may apply to a court of competent jurisdiction for enforcement of such award.

(e)     The arbitral tribunal shall decide any Dispute submitted by the parties to the arbitration strictly in accordance with the substantive Laws of Hong Kong, without regard to principles of conflict of laws thereunder, and shall not apply any other substantive Law.

(f)     Any party to the Dispute shall be entitled to seek interim or conservatory relief either from an emergency arbitrator or any court of competent jurisdiction prior to the constitution of the arbitral tribunal, or from the arbitral tribunal or any court of competent jurisdiction once the arbitral tribunal has been constituted.

(g)     During the course of the arbitral tribunal's adjudication of the Dispute, this Agreement shall continue to be performed.

16.7     **Notices.** Any notice required or permitted pursuant to this Agreement shall be given in writing and shall be given either personally or by sending it by next-day or second-day courier service, fax, electronic mail or similar means to the address of the relevant Party as shown on Schedule III (or at such other address as such Party may designate by five (5) Business Days' advance written notice to the other Parties to this Agreement given in accordance with this Section 16.7). Where a notice is sent by next-day or second-day courier service, service of the notice shall be deemed to be effected by properly addressing, pre-paying and sending by next-day or second-day service through an internationally-recognized courier a letter containing the notice, with a written confirmation of delivery, and to have been effected at the earlier of (i) delivery (or when delivery is refused) and (ii) expiration of two (2) Business Days after the letter containing the same is sent as aforesaid. Where a notice is sent by fax or electronic mail, service of the notice shall be deemed to be effected by properly addressing, and transmitting such notice, with a written confirmation of uninterrupted transmission or written confirmation of delivery, and to have been effected on the day the same is sent as aforesaid, if such day is a Business Day and if sent during normal business hours of the recipient, otherwise the next Business Day. Notwithstanding the foregoing, to the extent a "with a copy to" address is designated, notice must also be given to such address in the manner above for such notice, request, consent or other communication hereunder to be effective.

16.8     **Expenses.** If any action at law or in equity is necessary to enforce or interpret the terms of this Agreement, the prevailing Party shall be entitled to reasonable attorneys' fees, costs and necessary disbursements in addition to any other relief to which such Party may be entitled.

16.9     **Rights Cumulative; Specific Performance**. Each and all of the various rights, powers and remedies of a Party hereto will be considered to be cumulative with and in addition to any other rights, powers and remedies which such Party may have at Law or in equity in the event of the breach of any of the terms of this Agreement. The exercise or partial exercise of any right, power or remedy will neither constitute the exclusive election thereof nor the waiver of any other right, power or remedy available to such Party. The Parties acknowledge that each Party shall indemnify and hold harmless the other Parties for any breach of this Agreement by such Party.

Without limiting the foregoing, the Parties hereto acknowledge and agree irreparable harm may occur for which money damages would not be an adequate remedy in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that the Parties shall be entitled to injunction to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement.

16.10  **Successor Indemnification.** If the Company or any of its successors or assignees consolidates with or merges into any other Person and is not the continuing or surviving corporation or entity of such consolidation or merger, then to the extent necessary, proper provision shall be made so that the successors and assignees of the Company assume the obligations of the Company with respect to indemnification of members of the Board as in effect immediately before such transaction, whether such obligations are contained in the Articles, or elsewhere, as the case may be.

16.11  **Severability.** In case any provision of this Agreement shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby. If, however, any provision of this Agreement shall be invalid, illegal, or unenforceable under any such applicable Law in any jurisdiction, it shall, as to such jurisdiction, be deemed modified to conform to the minimum requirements of such Law, or, if for any reason it is not deemed so modified, it shall be invalid, illegal, or unenforceable only to the extent of such invalidity, illegality, or limitation on enforceability without affecting the remaining provisions of this Agreement, or the validity, legality, or enforceability of such provision in any other jurisdiction.

16.12  **Amendments and Waivers.**

(a)  Any provision in this Agreement may be amended and the observance thereof may be waived (either generally or in a particular instance and either retroactively or prospectively), only by the written consent of (i) the Company; (ii) the Founder HoldCo, and (iii) the Majority Class A Preferred Shareholder. Notwithstanding the foregoing, any Party may waive any of its rights under this Agreement (either generally or in a particular instance and either retroactively or prospectively) by an instrument in writing signed by such Party without obtaining the consent of any other Party. Any amendment or waiver effected in accordance with this Section 16.12 shall be binding upon all the Parties hereto.

(b)  If Section 9.1 applies, the Board may, in its sole discretion, amend this Agreement and the Charter Documents solely to permit for the issuance of New Securities in accordance with Section 3 and this Section 16.12, without the consent or approval of the Shareholders provided that the rights of any holder of Class A Preferred Shares or Class B Preferred Shares under this Agreement or the Charter Documents shall not be amended, and none of (i) the effect of admitting additional Shareholders or issuing additional Shares or other Equity Securities that have attached to such Equity Securities rights, preferences, privileges, limitations, restrictions or obligations that are junior to, *pari passu* with, superior to or different from those of the existing Shareholders or Shares, (ii) the amendment of this Agreement and the Charter Documents to provide for or effect the authorization or issuance thereof or (iii) any activities reasonably necessary or appropriate to accomplish the foregoing, shall, in and of itself, be deemed to adversely affect a Class A Preferred Shareholder  or Class B Preferred Shareholder  or require consent of any Class A Preferred Shareholder or Class B Preferred Shareholder pursuant to Section 16.12(a).

IN WITNESS WHEREOF, the parties hereto have caused their respective duly authorized representatives to execute this Agreement on the date and year first above written.


<u>THE COMPANY</u>:

SIGNED by    CHIU TAO              )

                                         )

for and on behalf of             )

**SMART KING LTD.**            )

in the presence of:-            )

FOUNDER HOLDCO:

SIGNED by                          )
**JIA YUETING**                    )
for and on behalf of               )
**FF TOP HOLDING LTD.**            )
in the presence of:-               )

<u>FOUNDER</u>:

SIGNED by                                    )
                                             )
**JIA YUETING**                              )
in the presence of:-                         )

<u>SERIES A INVESTOR</u>:

SIGNED by        CHIU TAO                    )
                                            )
for and on behalf of                        )
**SEASON SMART LIMITED**                    )
in the presence of:-                        )



# EXHIBIT E

**EXECUTION VERSION**

**AGREEMENT AND PLAN OF MERGER AND SUBSCRIPTION**

**by and among**

**FF GLOBAL HOLDINGS LTD.,**

**FF TOP HOLDING LTD.,**

**FF PEAK HOLDING LIMITED,**

**SEASON SMART LIMITED,**

**SMART KING LIMITED,**

**DOUBLE WIN LIMITED,**

and

**YUETING JIA**

(solely for purposes of Sections 5.4 and 8.2(iii))

**Dated as of November 30, 2017**

1

## AGREEMENT AND PLAN OF MERGER AND SUBSCRIPTION

This AGREEMENT AND PLAN OF MERGER AND SUBSCRIPTION (this "Agreement"), dated November 30, 2017, is by and among FF Global Holdings Ltd., an exempted company incorporated under the laws of the Cayman Islands (the "Company"), FF Top Holdings Ltd., a business company incorporated under the laws of the British Virgin Islands ("FF HoldCo"), FF Peak Holding Limited, a business company incorporated under the laws of the British Virgin Islands ("FF Parent"), Season Smart Limited, a business company incorporated under the laws of the British Virgin Islands ("BVI HoldCo"), Smart King Limited, an exempted company incorporated under the laws of the Cayman Islands and a wholly owned Subsidiary of BVI HoldCo ("NewCo"), Double Win Limited, an exempted company incorporated under the laws of the Cayman Islands and a direct wholly owned Subsidiary of NewCo ("Merger Sub"), and solely for purposes of Sections 5.4 and 8.2(iii), Yueting Jia, a natural person and resident of California ("FF Principal").

## WITNESSETH:

WHEREAS, BVI HoldCo, NewCo, Merger Sub and the Company have each determined that it is advisable and in the best interests of their respective shareholders for the Company to be acquired upon the terms and subject to the conditions set forth in this Agreement;

WHEREAS, immediately following (i) NewCo's acquisition of the shares of the Company held by FF HoldCo and (ii) NewCo's subsequent contribution of such shares of the Company to Merger Sub, the parties intend that Merger Sub shall be merged with and into the Company (the "Merger"), with the Company surviving the Merger and becoming a direct wholly owned Subsidiary of NewCo;

WHEREAS, following the Merger, BVI HoldCo intends to invest indirectly in the Company by subscribing for  Class A preferred shares, nominal par value US$0.00001, of NewCo (the "NewCo Class A Preferred Shares") in exchange for BVI HoldCo's contribution of cash to NewCo (the "Subscription"), which Subscription shall (except as provided in this Agreement) result in BVI HoldCo's ownership of a number of NewCo Class A Preferred Shares equal to the BVI HoldCo Share Consideration (as defined herein);

WHEREAS, the Board of Directors of the Company (the "Company Board") has (i) determined that it is in the best interests of its shareholders, and declared it advisable, to enter into this Agreement and the Plan of Merger (as defined herein) and (ii) approved the execution, delivery and performance of this Agreement and the consummation of the Transactions (as defined herein), including the Merger;

WHEREAS, the Board of Directors of BVI HoldCo has (i) unanimously determined that it is in the best interests of BVI HoldCo and its shareholders, and declared it advisable, to enter into this Agreement and the Ancillary Agreements, and (ii) approved the execution, delivery and performance of this Agreement and the consummation of the Transactions, including the Subscription;

4

any agreement or certificate delivered pursuant hereto or thereto (including the Ancillary Agreements) shall be interpreted without reference or giving effect to any materiality qualification or limitation set forth in such representation and warranty, including the terms "material," "materiality," "in all material respects," "Material Adverse Effect," "material adverse change," "immaterial" or "materially."  For avoidance of doubt, with respect to any breaches by or inaccuracies with respect to the FF Group's representations and warranties under ARTICLE III or pre-Closing breaches by the FF Group of any covenants, obligations or agreements hereunder, BVI HoldCo and Merger Sub proceeding to Closing shall in no way limit their right to claim for indemnity for such breaches or inaccuracies prior to Closing.

## ARTICLE IX

## MISCELLANEOUS

Section 9.1    Expenses.  Except as otherwise expressly provided herein, whether or not the Merger is consummated, all costs and expenses incurred in connection with the Merger, this Agreement, the other Transaction Documents and the transactions contemplated hereby and thereby (including attorneys' and accountants' fees and expenses) shall be paid by the party incurring or required to incur such expenses.

Section 9.2    Counterparts; Effectiveness.    This Agreement may be executed in counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument, but shall not become effective unless and until one or more counterparts hereof have been signed by each of the parties hereto and delivered (by telecopy, electronic delivery or otherwise) to all the other parties hereto.  Signatures to this Agreement transmitted by facsimile transmission, by electronic mail in "portable document format" (".pdf") form or by any other electronic means intended to preserve the original graphic and pictorial appearance of a document, will have the same effect as physical delivery of the paper document bearing the original signature.

Section 9.3    Governing Law.  This Agreement, and all claims, disputes or causes of action (whether at Law, in contract or in tort or otherwise) that may be based upon, arise out of or relate to this Agreement or the negotiation, execution or performance hereof, shall be governed by and construed in accordance with the Laws of Hong Kong, without giving effect to any choice or conflict of Law provision or rule that would cause the application of the Laws of any jurisdiction other than Hong Kong except that the following matters arising out of or relating to this Agreement shall be interpreted, construed and governed by and in accordance with the Laws of the Cayman Islands in respect of which the parties hereto hereby irrevocably submit to the exclusive jurisdiction of the courts of the Cayman Islands:  the Merger, the vesting of the undertaking, property and liabilities of each of  Merger Sub and the Company in the Surviving Company, the cancellation of the Company Shares, the fiduciary or other duties of the directors of the Company and the directors of Merger Sub and the internal corporate affairs of the Company and Merger Sub.

Section 9.4    Dispute Resolutions; Specific Enforcement.

(a)    Dispute Resolutions. Each of the parties hereto irrevocably agrees that any dispute, controversy, difference or claim (each, a "Dispute") arising out of or relating to this Agreement or the relationship between the parties hereto, or the interpretation, performance, breach, termination, exercise, validity or invalidity thereof, including the determination of the scope of this Agreement to arbitrate, or any Dispute regarding non-contractual obligations arising out of or relating to the Agreement shall be referred to and finally resolved by arbitration administered by the Hong Kong International Arbitration Centre (the "HKIAC") under the HKIAC Administered Arbitration Rules (the "HKIAC Rules") in force when the notice of arbitration is submitted by one party to another.

(b)    The law of this arbitration clause shall be Hong Kong law.  The seat of arbitration shall be Hong Kong.  The number of arbitrators shall be three. All of the arbitrators shall be qualified to practice law in Hong Kong.

(c)    The arbitration proceedings shall be conducted in English. To the extent that the HKIAC Rules are in conflict with the provisions of this Section 9.4, including the provisions concerning the appointment of the arbitrators, the provisions of this Section 9.4 shall prevail.

(d)    The award of the arbitral tribunal shall be final and binding upon the parties thereto, and the prevailing party may apply to a court of competent jurisdiction for enforcement of such award.

(e)    The arbitral tribunal shall decide any Dispute submitted by the parties to the arbitration strictly in accordance with the substantive Laws of Hong Kong, without regard to principles of conflict of laws thereunder, and shall not apply any other substantive Law.

(f)    Any party to the Dispute shall be entitled to seek interim or conservatory relief either from an emergency arbitrator or any court of competent jurisdiction prior to the constitution of the arbitral tribunal, or from the arbitral tribunal or any court of competent jurisdiction once the arbitral tribunal has been constituted.

(g)    During the course of the arbitral tribunal's adjudication of the Dispute, this Agreement shall continue to be performed.

(h)    The parties hereto agree that irreparable damage would occur (for which monetary damages, even if available, would not be an adequate remedy) in the event that any of the provisions of this Agreement were not performed, or were threatened to be not performed, in accordance with their specific terms or were otherwise breached.  It is accordingly agreed that, in addition to any other remedy that may be available to it, including monetary damages, each of the parties hereto shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement and all such rights and remedies at law or in equity shall be cumulative.  Each of the parties hereto agrees that it will not oppose the granting of an injunction, specific performance and other equitable relief on the basis that any other party has an adequate remedy at law or that any award of specific performance is not an appropriate remedy for any reason at law or in equity.  The parties further agree that no party to this Agreement shall be required to obtain, secure, furnish or post any

bond, security or similar instrument in connection with or as a condition to obtaining any remedy referred to in this <u>Section 9.4</u> and each party waives any objection to the imposition of such relief or any right it may have to require the obtaining, securing, furnishing or posting of any such bond, security or similar instrument.

Section 9.5    <u>Notices</u>.   All notices and other communications hereunder shall be in writing and shall be deemed duly given (a) upon personal delivery to the party to be notified if delivered before 5:00 p.m. on a Business Day at the recipient's location; (b) when received when sent by email or facsimile by the party to be notified, <u>provided</u>, <u>however</u>, that notice given by email or facsimile shall not be effective unless and until the receiving party delivers a written confirmation of receipt for such notice either by email or fax or any other method described in this <u>Section 9.5</u> or (c) the day following the day (except if not a Business Day then the next Business Day) on which the same has been delivered prepaid to a reputable national overnight air courier service; in each case to the party to be notified at the following address:

> To BVI HoldCo, NewCo or Merger Sub:
>
>> Season Smart Limited
>> c/o Rooms 4503 - 4505, 45/F, China Resources Building, 26 Harbour Road
>> Wanchai, Hong Kong
>> Facsimile: 852 2104 1663
>> Email: jackie.wah@cstgrouphk.com
>> Attention: Jackie Wah
>
> with copies to (which shall not constitute notice):
>
>> Baker & McKenzie LLP
>> 10 Harcourt Rd, Central, Hong Kong
>> Facsimile: +86 10 6505 2309
>> Email: bee.chun.boo@bakermckenzie.com
>> Attention: Bee Chun Boo
>
> To the Company:
>
>> FF Global Holdings Ltd.
>> 18455 S Figueroa St.
>> Los Angeles, CA 90248
>> Email: Wentao.Huang@ff.com
>> Attention: Wentao Huang
>
> with copies to (which shall not constitute notice):
>
>> Sidley Austin LLP
>> 1999 Avenue of the Stars, 17th Floor
>> Los Angeles, California 90067
>> Facsimile: (310) 595-9501

Email: vsekhon@sidley.com
Attention: Vijay S. Sekhon

To the FF Principal:

FF Global Holdings Ltd.
18455 S Figueroa St.
Los Angeles, CA 90248
Email: Wentao.Huang@ff.com
Attention: Wentao Huang

or to such other address as any party shall specify by written notice so given, and such notice shall be deemed to have been delivered as of the date so telecommunicated or personally delivered.  Any party to this Agreement may notify, in accordance with the procedures set forth in this <u>Section 9.5</u>, any other party of any changes to the address or any of the other details specified in this paragraph; <u>provided</u>, <u>however</u>, that such notification shall only be effective on the date specified in such notice or five Business Days after the notice is properly given, whichever is later.  Rejection or other refusal to accept a notice duly given in the manner set forth herein or the inability to deliver because of changed address of which no notice was given shall be deemed to be receipt of the notice as of the date of such rejection, refusal or inability to deliver.

Section 9.6    <u>Assignment; Binding Effect</u>.  Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned or delegated by any member of the FF Group without the prior written consent of BVI HoldCo.  For the avoidance of doubt, at any time prior to or after the Closing, BVI HoldCo may assign its rights and interests, and delegate its obligations hereunder to any Affiliate or third party that has financial resources or the possible financing capability to perform BVI HoldCo's obligations under this Agreement without the prior written consent of the FF Group.

Section 9.7    <u>Severability</u>.    Any term, covenant, restriction or provision of this Agreement which is invalid or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such invalidity or unenforceability without rendering invalid or unenforceable the remaining terms, covenants, restrictions and provisions of this Agreement in any other jurisdiction.  If any provision of this Agreement is so broad as to be unenforceable, such provision shall be interpreted to be only so broad as is enforceable.

Section 9.8    <u>Entire Agreement</u>.    This Agreement, together with the exhibits and schedules hereto, the Company Disclosure Letter, the BVI HoldCo Disclosure Letter, the Ancillary Agreements and  the Confidentiality Agreement, constitute the entire agreement, and supersede all prior agreements and understandings, both written and oral, between the parties, or among any of them, with respect to the subject matter hereof and thereof, and, subject to <u>Section 9.11</u>, this Agreement is not intended to grant standing to any person other than the parties hereto.

Section 9.9    <u>Amendments; Waivers</u>.  At any time prior to the Effective Time, any provision of this Agreement may be amended or waived if, and only if, such amendment or waiver is in writing and signed, (a) in the case of an amendment, by a duly authorized

64

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered as of the date first above written.

**FF GLOBAL HOLDINGS LTD.**

By:_____

Name:

Title:


**FF TOP HOLDING LTD.**

By:_____

Name:

Title:


**FF PEAK HOLDING LIMITED**

By:_____

Name:

Title:


**YUETING JIA**
(solely for purposes of Sections 5.4 and 8.2(iii))

_____

Name:  Yueting Jia


*[Signature Page to Agreement and Plan of Merger]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered as of the date first above written.

**SEASON SMART LIMITED**

By:_____
     Name:
     Title:

**SMART KING LIMITED**

By:_____
     Name:
     Title:

**DOUBLE WIN LTD.**

By:_____
     Name:
     Title:

[*Signature Page to Agreement and Plan of Merger*]

# EXHIBIT F

| | |
|---|---|
| **From:** | Filip Nordlund <fnordlund@hkiac.org> on behalf of arbitration <arbitration@hkiac.org> |
| **Sent:** | Thursday, October 25, 2018 2:13 AM |
| **To:** | John Rhie; Duncan Watson; Nathaniel Lai; Tom Brebner; James Chun; Brian Timmons; David Perlson; Lee Rosenberg; David Ning; 'Lawrence.Lee@bakermckenzie.com'; 'Anthony.Poon@bakermckenzie.com'; 'Roberta.Chan@bakermckenzie.com'; 'Yvette.Yu@bakermckenzie.com'; 'Miranda.Lee@bakermckenzie.com'; 'BrianKT.Wong@bakermckenzie.com'; 'Ingloong.Yang@lw.com'; 'ChiHo.Kwan@lw.com'; 'Daniel.Schecter@lw.com'; 'Robert.Ellison@lw.com'; 'Sam.Wong@lw.com' |
| **Cc:** | 'Peter Thorp'; Filip Nordlund |
| **Subject:** | HKIAC/A18176: Smart King Ltd. v. (1) Season Smart Limited; (2) Yueting Jia |
| **Attachments:** | Award of Emergency Arbitrator dated 25 October 2018.pdf; Fee note of Mr. Peter Thorp dated 25 October 2018.pdf; Statement of account in HKIAC case no. A18176 dated 25 October 2018.pdf |

Dear Mesdames,
Dear Sirs,

We refer to the captioned matter and the Application for Appointment of Emergency Arbitrator dated 3 October 2018.

**Emergency Award**
We attach an electronic copy of the <u>Award of Emergency Arbitrator dated 25 October 2018</u> affixed with HKIAC's seal (the "**Award**"). Hardcopy originals of the Award will be delivered to the parties by courier shortly.

**Fee Note**
We attach a copy of the fee note submitted by the Emergency Arbitrator, Mr. Peter Thorp, which we will proceed to settle from the deposits paid by Claimant for these emergency relief proceedings. An updated statement of account reflecting the aforementioned pending payment is also attached for the parties' and the Emergency Arbitrator's reference.

Thank you for your attention.

Yours faithfully,
Filip Nordlund
_____

Deputy Counsel | **Hong Kong International Arbitration Centre**
**Address: 38/F, Two Exchange Square, 8 Connaught Place, Central, Hong Kong**
D:  +852 2912 2207    F:  +852 2524 2171
E-mail: fnordlund@hkiac.org
_____

Disclaimer:
The contents of this e-mail are intended for the named addressee only. It contains information which may be confidential and which may also be privileged. Unless you are the named addressee (or authorised to receive for the addressee) you may not copy or use it, or disclose it to anyone else. If you received it in error please notify us immediately and then destroy it. Further, we make every effort to keep our network free from viruses. However, you do need to verify that this email and any attachments are free of viruses as we can take no responsibility for any computer virus which might be transferred by way of this email.